511 F.2d 839
 88 L.R.R.M. (BNA) 2467, 75 Lab.Cas. P 10,609
 GREAT COASTAL EXPRESS, INC., Plaintiff-Appellee-Cross Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN & HELPERS OFAMERICA, an
unincorporated association,
Defendant-Appellant-Cross Appellee.
 Nos. 73--2393, 73--2448.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 3, 1974.
Decided Jan. 21, 1975.
 
 Sidney Dickstein, Washington, D.C. (George Kaufmann, Anthony F. Troy, Ira R. Mitzner and Dickstein, Shapiro & Morin, Washington, D.C., on brief), for defendant-appellant in No. 73--2393 and for plaintiff-appellee in No. 73--2448.
 J. W. Alexander, Jr., Charlotte, N.C. (James M. Minor, Jr., Richmond, Va., and John O. Pollard, Charlotte, N.C., on brief), for plaintiff-appellee in No. 73--2393 and for defendant-appellant in No. 73--2448.
 Before RUSSELL, FIELD and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 This suit, originally filed in a Virginia state court, was removed to federal district court pursuant to 28 U.S.C. § 1441(b) as a claim arising under §§ 301 and 303 and of the Labor Management Relations Act, 29 U.S.C. §§ 185 and 187.
 
 
 2
 This appeal results from two jury trials in which the appellant-defendant union, International Brotherhood of Teamsters, etc. (IBT), was found to have been responsible for damages resulting from illegal secondary boycotts conducted by three of its local unions in violation of 29 U.S.C. § 158(b)(4).
 
 
 3
 The employer, Great Coastal Express, Inc. (the company), contended throughout both trials that all of its damages, alleged to be $942,065, resulted from the illegal acts of IBT because the company had not suffered damage until IBT supplemented its legal tactics with illegal ones. The first jury returned a general verdict against IBT for $1,300,000, which the district court set aside on IVT's motion for judgment non obstante veredicto, or in the alternative for a new trial, as being excessive. See 350 F.Supp. 1377 (E.D.Va.1972). A new trial was ordered to reconsider the issue of damages, and the verdict reached at the second trial was for $806,093, upon which the district court entered judgment.
 
 
 4
 IBT contends on appeal that the court wrongfully allowed the issue of whether or not the local unions, and their officers and members, were the agents of IBT to go to the jury in the first trial; that the company should not recover any damages because it failed to particularize its losses to those caused by illegal activity as distinguished from losses caused by legal union activity; that the court erred in restricting the second trial to damages; and that the instructions to the second jury were erroneous. For reasons which follow, we affirm the judgment of the district court. Because of our resolution of the case, it will not be necessary to reach the issue of the violent conduct of the unions raised on cross appeal by the company.
 
 
 5
 The company is an interstate truck common carrier, based in Richmond, whose business consists primarily of transporting general commodity freight from twenty-six Virginia counties into New Jersey and parts of New York, Connecticut and Pannsylvania. The company had been a party to the National Master Freight Agreement with IBT from 1964 until expiration of the 1967 contract on March 31, 1970. The parties reached an impasse during negotiations for a new contract, and the company refused to become a party to the new National Master Freight Agreement. Richmond Local 592 applied for strike benefits from IBT on August 6, 1970 and went on strike August 9, 1970. IBT approved payment on the strike benefits on August 10, 1970, and, on August 13, Local 107 in Philadelphia and Local 641 in Jersey City, New Jersey also went on strike against the company. Retroactive strike benefit payments were also approved by IBT for the latter two locals. All three locals were striking over the company's refusal to become a party to the National Master Freight Agreement, and no contention is made that the cause for the strike was not quite a legal reason.
 
 
 6
 The strike initially had little or no effect on the company. It was able to continue all its operations by using office employees, salesmen, supervisors, and newly-hired replacement drivers. Employees not on strike willingly crossed union picket lines at Richmond, and the company began making direct pickups and deliveries in its northern territories so that the picketed Jersey City terminal was practically unused. At the end of the seven or eight month continuance of the strike, however, the company's freight-hauling business had been effectively shut off. The argument between the parties is over the legality of a roving picket operation, and the extent to which illegal secondary boycott activities damaged the company.
 
 
 7
 The company's attack in the first trial was two-pronged, in that it sought damages for alleged secondary boycott activities in violation of LMRA § 303, 29 U.S.C. § 187, and also damages for various alleged acts of violence and sabotage. At the close of the company's evidence, the court granted defendant's motion for a directed verdict as to the violence aspect of the case, holding that the burden of proof for finding IBT liable for acts of violence committed is the higher standard of proof of clear and convincing evidence, rather than a preponderance, and that the company had failed to meet this higher standard. See U.M.W. v. Gibbs, 383 U.S. 715, 735, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), construing Norris-LaGuardia Act, § 6, 29 U.S.C. § 106.
 
 
 8
 We should say here, and we emphasize, that the union does not contest the fact that there was evidence from which a jury could find an illegal secondary boycott. Indeed, the matter is admitted to be clearly a jury question. And the matter having been decided in favor of the plaintiff under proper instructions, it is, in all events, removed from our consideration. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946). The only question before us as to that finding is whether or not a partial new trial was proper.[1]
 
 
 9
 The company offered evidence as to illegal secondary activities by representatives of customers it had serviced during the strike, and drivers it had hired to replace the strikers, as well as from its own executives and other employees and the president of the Richmond local and an international director of the union.
 
 
 10
 The principal witness concerning the amount of the company's damages was a Certified Public Accountant, Lepp, who testified that he had worked with Great Coastal for several years and had examined the books of Great Coastal for periods before, during and after the strike. Lepp stated that he noted a disruption in the company's general pattern of receipts and profits after the strike started. On the basis of the company's business growth pattern and operating ratio over a period of time prior to the strike, Lepp projected a figure of anticipated profit during the seven months of the strike as being $322,438. He added to this the actual loss incurred by the company during the strike, $274,895, to reach a total damage figure of $597,333 during the strike. Lepp then computed a projected profit figure of $495,715 for the period from the end of the strike to the end of 1971, subtracted $150,983 actual profit which the company showed in this post-strike period, and added the additional damage figure of $344,732 to $597,333 in arriving at the total damage estimate of $942,065.
 
 
 11
 The key witness for IBT with respect to union activity after the strike began was William A. Hodson, president of the Richmond Local No. 592. Hodson testified that he generally was in charge of the strike, and was personally involved in the picketing on occasion. The union began utilizing roving, or ambulatory, pickets to follow company trucks to customer business locations, and Hodson testified that these pickets were assigned on a weekly basis to go throughout the company's territory. All of the roving pickets' expenses were paid, in addition to strike benefit payments, by the union; Hodson testified that over $49,000 in strike benefits were paid, and that Local 592 had also received $10,000 from IBT, $10,000 from the Eastern Conference of IBT, and $2,500 from various Joint Councils of IBT, apparently in addition to authorized strike benefits, to further assist in financing the strike.[2] Hodson sent a letter to all of the company's customers, advising them that Local 592 was on strike against Great Coastal because of its unfair labor practices, expressing a desire to lawfully picket on their premises when Great Coastal trucks were present, and requesting their cooperation during the strike. He further testified that a purpose of the roving pickets was to receive assistance or cooperation from the company's customers, and that he had complained to IBT about sister Teamster locals, not employed by the company, who refused to respect their picket lines. At the first trial he admitted that a purpose of the roving pickets was to induce employees of Great Coastal customers not to unload Great Coastal freight, and at the second trial he admitted such was their primary purpose. Taken as a whole, Hodson's testimony left little doubt that Local 592 tried to get all IBT local unions, whether they represented Great Coastal employees at other locations or not, to assist in this strike in refusing to unload Great Coastal freight, and that nonteamster unions had also been asked to help.
 
 
 12
 Evidence, in addition to Hodson's testimony, indicated that Local 592 kept close contact during the strike with both the Eastern Conference of IBT and IBT headquarters itself, and that almost all of Local 592's requests for assistance, financial or otherwise, were complied with. IBT was advised on numerous occasions of the existence of the roving pickets. On one occasion, Eastern Conference director and IBT director and vice president Trerotola wrote to over 100 other teamster locals advising them that the roving pickets had not been entirely successful and requested any assistance they could legally give. He enclosed a list of Great Coastal customers.
 
 
 13
 The gist of Trerotola's testimony as to IBT's involvement and assistance during the strike may be summarized in short order; Trerotola stated consistently that he was a busy man, that it was his signature on various letters written to Local 592 and IBT, but that he did not specifically recall signing the letters because of the bulk of correspondence his office receives and the fact that he delegates many responsibilities. He said the Eastern Conference may have assisted Local 592 in getting various correspondence mailed and in obtaining contributions to its strike fund; that IBT often asked other unions to help in any way they could; and that he had requested only lawful assistance from other teamster locals. He said he had no knowledge of any illegal secondary activity in connection with this strike.
 
 
 14
 The district court's opinion on the motion for judgment non obstante veredicto following the first verdict of $1,300,000 is reported at 350 F.Supp. 1377. IBT raised the same issue in that motion as here with respect to whether the company had made the requisite showing of agency, and also argued that the jury charges were contradictory, and that the jury had awarded punitive damages in violation of the Labor Management Relations Act, § 303. The court relied on the case of International Brotherhood of Teamsters v. United States, 275 F.2d 610 (4th Cir. 1960), in concluding that there had been a sufficient showing of agency to let the jury consider it. The court also ruled against IBT on the jury charge issue, but did hold that the excessive verdict of damages was partially caused by the jury's consideration of the gross and vicious conduct attributed to the members of the local union and their sympathizers. The court stated the damage question was complicated and concluded a remittitur was improper. The motion for judgment N.O.V. was then denied, and a retrial ordered on the issue of damages.
 
 
 15
 At the second trial, the company relied primarily on testimony of its president and vice-president, who testified at length concerning the deterioration of company business and loss of customers, and Lepp's testimony concerning the $942,065 damages claimed. IBT called no witnesses. Pertinent exhibits from the first trial were introduced by both sides for the jury to consider in arriving at damages. The company again took the position that no damage had been caused until the unlawful secondary boycott commenced. A part of the uncontradicted evidence was that numbers of freight shipments went undelivered because of the illegal secondary boycott actions. The jury concluded that the company had proved damages of $806,093.
 
 
 16
 IBT's first contention, that the court should have ruled as a matter of law that there was insufficient evidence for the jury to find an agency relationship between it and the striking local unions, is without merit. The Supreme Court has recognized, in suits brought under the LMRA § 303, that the responsibility of a union for the acts of its officers and members 'is to be measured by reference to ordinary doctrines of agency.' United Mine Workers v. Gibbs, 383 U.S. 715, 736, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966). This court has previously held, in another context (a criminal case with its more stringent burden of proof), that the IBT constitution provides for such far-reaching control of local unions that the locals, in essence, are not autonomous but are subdivisions of IBT. International Brotherhood of Teamsters v. United States, supra, 275 F.2d at 614. The district court here compared the constitution in effect when the Teamsters case was decided, found no significant differences, and concluded, quite correctly, that under the evidence in this case the jury was entitled to decide the issue. 350 F.Supp. at 1379. That being so, the issue is closed, for the weight of the evidence and the credibility of witnesses is solely within the province of the jury. A. & G. Stevedores v. Ellerman Lines, 369 U.S. 355, 358--359, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Lavender v. Kurn, 327 U.S. 645, 652--653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). IBT claims no error as to the evidence admitted, which was ample to show participation by IBT, or in the jury charge, so the jury's finding of an agency relationship must stand.
 
 
 17
 The above discussion as to agency applies in large part to the jury finding that IBT had committed illegal secondary acts. As stated before, the defendant admits this was a jury question. The court, at the first trial, very carefully charged the jury as to the law concerning secondary boycotts, and IBT does not contest the charge on appeal. From the testimony and other evidence recited, it goes without saying that the jury had abundant evidence to find that IBT had induced, encouraged, threatened, or coerced employees of Great Coastal customers to withhold the labor from their employers, with whom they had no dispute, and that IBT so acted for the purpose of achieving the unlawful objectives set out in the National Labor Relations Act, § 8(b)(4), 29 U.S.C. § 158(b)(4). The record also contains abundant evidence from which the jury could have found, as it obviously did, that almost every truck of Great Coastal was followed by roving pickets from the inception of the strike; that initially they were to little or no avail; that after requests of Trerotola and Hodson were made to the other unions the roving pickets became almost completely effective because the employees of the consignees would not accept delivery from Great Coastal; and on account of the illegal secondary boycott activities Great Coastal was damaged.
 
 
 18
 The thrust of IBT's complaint concerning the second trial, though, is not the sufficiency of the evidence, but that the company should have separated union activity that was clearly lawful, and for which no damages could be had, from the alleged unlawful activities, and thus established the proximate cause of its damages with more specificity. The company's theory throughout both trials was that it had suffered no damages at issue here because of lawful union activity, but that all of such damages resulted from IBT's unlawful acts which ultimately shut down business entirely.
 
 
 19
 What IBT does not take into account is that at the second trial, the trial judge, out of an abundance of precaution, submitted not only the amount of damages, but also the proximate cause thereof to the jury. Thus, there were the two issues tried at the second trial, not only the issue of the amount of damages.
 
 
 20
 The judge again correctly charged the jury which ambulatory picketing activities were lawful, and which were unlawful, and, among several references to proximate cause in his charge which required the company to prove its damages were proximately caused by the unlawful activities of the union as contrasted to the lawful, told the jury:
 
 
 21
 'You understand, of course, that you may not award the plaintiff damages simply because of lost money during the strike or for money lost as a result of the union engaging in legal and permitted activity. In a strike situation, infliction of losses both upon the union and the employer is to be expected. It is not an occasion for liability unless the losses resulted from illegal strike activity. For this reason, you may only award damages where Great Coastal has proved by a preponderance of the evidence that it was so damaged.'
 
 
 22
 We think this case is not one where the plaintiff should be faulted out of its judgment for not proving its damages with more exactness and precision. The Supreme Court has held, in an anti-trust case, that where the amount of damages cannot be ascertained with certainty, 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.' Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). This circuit has previously adopted the Story Parchment reasoning in an action under 29 U.S.C. § 187 very similar to the one at hand. United Mine Workers v. Patton, 211 F.2d 742 (4th Cir. 1954). IBT's contention that Local 20, Teamsters Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), would mandate a contrary result is not well founded, for Morton was a completely different case. In Morton, the district court, sitting without a jury, awarded the plaintiff $9,000 damages, under state law as a pendent claim, for loss of one of its customers, as a part of plaintiff's total damages. The customer had been persuaded by the union to cease doing business with the plaintiff, but its employees had not been approached. The Supreme Court held that the district court had no power to award damages proximately caused by such lawful, primary activities, since permitted by federal law, even though state law would have allowed a recovery in such a case. 377 U.S. at 259--260, 84 S.Ct. 1253. Along the same line, the court set aside the judgment for loss of certain customers whose business had been discouraged because of the strike, but who were not affected by any unlawful activity, because the union should not be responsible for damage by lawful activity even though it may have been engaged in unlawful activity elsewhere. 377 U.S. at 261--262, 84 S.Ct. 1253. But the court sustained the judgment of the trial court for damages for unlawful secondary boycott activities, the district court having in its opinion separated the items of damage.
 
 
 23
 In this regard, IBT argues that the court should have required a special verdict from the jury. F.R.Civ.P. 49 gives district courts broad discretion in determining the form of verdict. While we have no occasion here to decide whether the district judge has uncontrolled discretion in this regard,[3] we do note that there apparently has never been a reversal for abuse of discretion in determining the form of verdict.[4] We hold, with Toth v. Corning Glass Works, 411 F.2d 912, 914, n. 2 (6th Cir. 1969), that where the complaining party made no request for a special verdict to the trial court, it cannot raise the issue for the first time on appeal. Since IBT acceded to the general verdict without complaint in both trials in the court below, it may not now assign error in the district court's submission of the issues by way of general verdict.
 
 
 24
 Turning now to the issue of whether a partial new trial was appropriate, we note that such is expressly permitted by F.R.Civ.P. 59(a). The principal case with respect to ordering a new trial as to damages only is Gasoline Products Co. v. Champlin Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). The court, in Gasoline Products, held 'that, where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again.' 283 U.S. at 499, 51 S.Ct. at 515. The court then proceeded to analyze the contracts in dispute to determine whether the damages and liability issues were separable, and concluded that, although the verdict on the contract sued upon by the plaintiff was affirmed, since the first verdict on the counterclaim was for less than the total damages claimed on various contracts, the extent of the damages depended on the extent of the undertakings which were in dispute, and the issues were so interwoven that a second jury could not fairly consider damages alone in a new trial on the counterclaim. And, it is noteworthy that the court did separate and let stand the verdict for the plaintiff on the contract sued upon without a new trial.
 
 
 25
 This court has considered new trials limited to damages on several occasions since the Gasoline Products case. It is well settled that granting or denying a new trial, either for excessiveness or inadequateness of the verdict, is discretionary with the trial court, and not reviewable absent a showing of abuse of discretion. Young v. International Paper Co., 322 F.2d 820, 822 (4th Cir. 1963). Most of the cases considered by this court have concerned the district court's discretion in ordering a partial new trial for inadequate damages, but the same general principles apply whether the verdict is attacked either for inadequacy or excessiveness. DeFoe v. Duhl, 286 F.2d 205 (4th Cir. 1961) (citing Virginia law); see Note, 29 A.L.R.2d 1202 (on inadequacy). The only case where a new trial on all issues was suggested because of excessive damages was United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4th Cir. 1955), cert. den., 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).
 
 
 26
 In Haislip Baking, an action based on 29 U.S.C. § 185(b), it is true the court stated that '(t)he verdict on the first trial was so excessive and so manifestly based on improper consideration, instead of upon the record, that it should have been set aside in its entirety and a complete new trial ordered,' but the court then proceeded to direct entry of judgment for the defendant instead of remanding for a new trial. The jury in that case had erroneously not been instructed on mitigation of damages and had erroneously been allowed to consider the parent union as responsible for a wildcat strike. It was this latter consideration the court referred to in its reference to the record. Neither consideration is present here, and even considering the above quoted statement from Haislip as a holding, it does not control the disposition of this case.
 
 
 27
 In another Fourth Circuit case involving excessive damages, the trial court ordered a remittitur instead of a partial new trial. Ford Motor Co. v. Mahone, 205 F.2d 267 (4th Cir. 1953). This court reversed and ordered a new trial as to all the issues when it was found that one of the jurors had obvious partisan bias in favor of one of the parties, and this in a 'hotly contested' trial as to both liability and damages which resulted in a verdict the court found based on pity and sympathy. Likewise, the problem is not presented in this case.
 
 
 28
 This court has noted that there is 'always a presumption in favor of the validity of a verdict if it is the result of honest judgment,' City of Richmond v. Atlantic Co., 273 F.2d 902, 916 (4th Cir. 1960), but has found a new trial on all issues to be required where a totally inadequate verdict was rendered which could only have been a sympathy or compromise verdict. Southern Railway v. Madden, 235 F.2d 198 (4th Cir. 1956), cert. den., 352 U.S. 953, 77 S.Ct. 328, 1 L.Ed.2d 244 (1956). But where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions, a second trial limited to damages is entirely proper. Young v. International Paper Co., supra; Mason v. Mathiasen Tanker Industries, Inc., 298 F.2d 28 (4th Cir. 1962), cert. den., 371 U.S. 828, 83 S.Ct. 23, 9 L.Ed.2d 66 (1962).
 
 
 29
 The matter of a partial new trial has been frequently considered since Gasoline Products and its subsequent articulation in F.R.Civ.P. 59(a), and one of the leading texts states that it 'may be regarded as settled that if an error at the trial requires a new trial on one issue, but this issue is separate from the other issue in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue.' 11 Wright & Miller, Federal Practice and Procedure, Civil (1973), p. 93; see also Moore's Federal Practice, 2nd Ed., 1974, 59.06. And, we have held in Young v. International Paper Company, supra, that the action of a district judge in setting aside a verdict as to damages, and at the same time refusing to set aside the same verdict as to liability, should be affirmed unless the district judge abused his discretion.
 
 
 30
 In short, our task here is to determine whether the district court's conclusion that the first verdict was based on honest judgment by a well-intentioned jury, and that the liability and damage issues were not inextricably intertwined, so that a partial new trial was fair to both parties, was an abuse of discretion, and whether the presumption of the validity of the verdict has been overcome. IBT argues that the evidence of violence heard by the jury, before the court directed a verdict against the company as to that issue, so inflamed the jury, and caused them to render a verdict in excess of damages proven, that the entire verdict was tainted. We cannot agree. The court charged the jury that no acts of violence testified to could be considered in assessing any damages, and that damages were limited to losses which flow proximately from any illegal activity the jury might find. During deliberations, the jury inquired of the court, 'What amount of damages lost in dollars is the plaintiff asking? Is it the $942,065 figure?,' to which the court responded '. . . yes . . . I must tell you that you are not to concern yourselves with what the plaintiff asks for unless it coincides with the evidence as you find it.' 350 F.Supp. at 1378. It is obvious from the foregoing that the jury did not consider the $942,065 as a limiting figure, but we are unable to say from the record that the excessive verdict was caused from anything more than a misunderstanding of the jury charge as not limiting the recovery to pecuniary loss as mentioned in the question asked the court. There is no basis to support the defendant's contention that the first verdict was fatally infected by prejudice. To hold otherwise would be speculation on our part as to what the jury considered in its deliberations, and this we should not do, for, in the words of Mr. Justice Brandeis, '(a)ppellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct.' Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933). Since no error is alleged as to any of the evidence, jury charges, or other relevant proceedings during the first trial, and especially considering the admitted and abundant evidence as to illegal secondary boycott activities, we are of opinion that the presumption in favor of the validity of the first verdict, insofar as it applies to the finding of IBT's liability, has not been overcome. City of Richmond v. Atlantic Co., supra.
 
 
 31
 Nor are we able to agree that the issues of liability and damages were so closely intertwined that the second jury should not consider the issue of damages apart from liability. The jury in the first trial, under proper instructions, ascertained liability, and in the second trial the judge ever so carefully charged the jury only that the defendant had been found liable for certain acts of unlawful secondary boycott activity, and having again defined which activities were lawful and which were not, left to the jury the question which of the unlawful acts, if any, caused damage to the plaintiff, and which did not, and also the amount of the damages. We thus find the ruling of the district court as it awarded a partial new trial was not an abuse of discretion and free from exception. We are of opinion the issues in the second trial were properly separated from those in the first, and that the issues of liability and damages were not so inextricably interwoven that a new trial was required on all issues. We are further of opinion this phase of the case is controlled by those cases exemplified by Young v. International Paper Co., and Mason v. Mathiasen Tanker Industries, Inc.
 
 
 32
 The union's final contention that the second jury was improperly instructed is likewise without merit. It complains that the district judge only instructed the jury that the activity of the union at certain of the plaintiff's customers, and as to certain of such customers' employees, had been found to be unlawful. This instruction, as we have before mentioned, was proper, and indeed could only have been favorable to the defendant, for the plaintiff took the position and offered evidence which tended to show that all its damages claimed in the second trial were caused by the unlawful activities of the defendant as distinguished from the lawful. The defendant had every opportunity, in the second trial as at the first, to contest both the proximate cause of the damage as well as its amount, and yet offered no evidence. The fact that the trial tactics did not succeed may not be laid to the district judge, whose every act complained of was free from exception.
 
 
 33
 Accordingly, the judgment of the district court is
 
 
 34
 Affirmed.
 
 
 
 [1]
 There is a question of some consequence as to whether or not this argument was properly presented to the district court so that it might be argued here. McGowan v. Gillenwater, 429 F.2d 586 (4th Cir. 1970). We do not reach this procedural question
 
 
 [2]
 Although the matter is unclear from the evidence presented, the $49,000 figure apparently includes all union monies, from whatever source within the union, expended on the strike. IBT records introduced in evidence show that it paid $24,160, as authorized strike benefits, to individual strikers
 
 
 [3]
 See Skidmore v. Baltimore & Ohio RR., 167 F.2d 54, 66--67 (2nd Cir. 1948), cert. den., 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948)
 
 
 [4]
 9 Wright and Miller, Federal Practice and Procedure, Civil, § 2505, p. 492; 5A Moore's Federal Practice, 2d Ed., 1974, 49.03(1), p. 2208