**CHRYSLER CORPORATION et al.**

v.

**SUPERIOR DODGE, INC., et al.**

**Civ. No. Y–77–40.**

United States District Court, D. Maryland.

Aug. 3, 1979.

Robert Ehrenbard, Michael A. Butterworth, Kevin G. McAnaney, New York City, and Robert E. Sharkey, Baltimore, Md., for plaintiffs.

Robert F. Wood, Rochester, N. Y., and Walter E. Laake, Jr., Langley Park, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

For nearly a decade, this litigation has proceeded along a tortuous course which shows signs of continuing for perhaps another decade. The resolution of one action merely spawns another, as facts and issues which were once decided subsequently emerge as the subject of new dispute. The present round of litigation is an independent action brought by Chrysler Corporation (hereinafter "Chrysler") to overturn a judgment which was previously entered against its predecessors, Chrysler Motors Corporation (hereinafter "Motors") and Chrysler Credit Corporation (hereinafter "Credit"). In *Superior Dodge, Inc., et al. v. Chrysler Corporation, et al.,* Civil Action No. 73–646–Y, a federal court jury found Motors and Credit liable on several counts for the business failure of Superior Dodge, Inc. (hereinafter "Superior") and awarded Superior and its sole shareholders Marvin and Betty Greenfield damages totalling $481,600. Chrysler now seeks equitable relief from this judgment on the ground that the jury verdict was obtained by an unconscionable scheme under which Greenfield withheld from Chrysler certain documents alleged to be critical to Chrysler's defense.

Following a court trial and a review of the evidence presented, the Court determines that the judgment entered in Civil Action 73–646–Y will not be set aside. Accordingly, for the reasons stated herein, judgment in this action will be entered in favor of the defendants. All findings of

fact and conclusions of law are made in accordance with Rule 52(a), Federal Rules of Civil Procedure, whether or not specifically so stated.

## I.  THE BACKGROUND FACTS

From August, 1968 until early 1970, Marvin H. Greenfield was the principal shareholder and officer of a Dodge dealership in Manassas, Virginia known as Suburban Dodge. In early 1970, for reasons later subject to dispute, Greenfield relocated his Dodge franchise in the Baltimore metropolitan area, where he conducted business as the principal shareholder and operator of Superior Dodge, Inc. After less than a year's operation, Superior closed its doors. The still continuing litigation which has grown out of the circumstances of Superior's demise 8 and ½ years ago concerns the reasons that prompted Greenfield's move from Manassas to Baltimore and the cause of the failure of the Baltimore dealership.

### A.  THE 1973 CIVIL ACTION

In December, 1970, when Greenfield and Superior had allegedly failed to comply with certain automobile financing agreements with Credit, Credit brought an action for the replevin of certain property in the possession of Greenfield and Superior. *Chrysler Credit Corporation v. Superior Dodge, Inc.,* Civil Action No. 70–1396–Y. In response to this suit, Greenfield and Superior filed a counterclaim charging willful, intentional, and malicious misconduct on the part of Credit in causing the failure of Superior.

After the counterclaim had been dismissed and beyond the time allowed for an amended counterclaim, Greenfield and Superior filed a separate action against Chrysler and related corporations, including Motors and Credit, which charged Chrysler with liability for Superior's failure on nine counts: violation of the Dealer's Day in Court Act, 15 U.S.C. §§ 1221 and 1222 [1] (Count I); breach of contract (Count II); misrepresentation (Count III); breach of fiduciary duty (Count IV); tortious interference with contractual relationships (Count V); conspiracy to damage or to defraud (Count VI); violations of Sections 1 and 2 of the Sherman Act (Count VII); and violations of Sections 3 and 7 of the Clayton Act (Counts VIII and IX).

Generally, Greenfield and Superior alleged that with the aid of financing provided by Credit, Greenfield had operated a successful Dodge dealership in Manassas, Virginia. Sometime in the fall of 1969, Greenfield contends, representatives of Motors began urging him to sell his Virginia dealership and relocate to a larger market such as Baltimore. Following the continued urging of Motors and based upon certain alleged representations concerning Chrysler's support should he move to Baltimore, Greenfield sold his dealership in Manassas and committed himself to relocation of the business in Baltimore. However, once he had committed himself to the Baltimore move, Greenfield allegedly encountered resistance from Motors relative to his first choice of a location for the Baltimore dealership. Greenfield had negotiated with Stanley H. Wilkins to take over the premises then occupied by Hoffman and Green, a Chrysler affiliated dealership. Wilkins had terminated his franchise with Chrysler and was in the process of relocating his operation in Glen Burnie, Maryland as a Buick franchisee. Greenfield alleged that contrary to earlier representations by Chrysler that he could take over the Hoffman-Green location, presumably an excellent facility

1.  15 U.S.C. § 1222 provides:

> An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufactur-
>
> er from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not reviewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

for the sale and servicing of automobiles, he was forced to accept a franchise at a less desirable location.

In addition, Greenfield maintained that Motors and Credit frustrated the successful operation of his fledgling Baltimore dealership by the following alleged pattern of misconduct:

(1) Motors refused to fill Greenfield's orders for new automobiles for sale to the public;

(2) Credit refused to apply, as had been previously agreed, certain prepayments tendered by Greenfield on a capital loan which Credit had extended to Greenfield and Superior;

(3) Credit intimidated Greenfield in order to cause him to increase his capital investment in Superior despite earlier statements from Credit that the financial structure of Superior was satisfactory;

(4) Credit refused to floor plan or finance the acquisition by Superior of new or used cars for sale; and

(5) Chrysler acquired and operated a dealership known as Central City Dodge as a "factory store" in direct competition with Superior.

Accordingly, Greenfield and Superior sought relief for the allegedly false representations which had prompted Greenfield to sell his Virginia dealership and move to Baltimore and for the allegedly unlawful actions which he maintained caused the failure of Superior.

*1. The Conduct of Discovery in the 1973 Action*

The parties conducted discovery in *Superior Dodge, Inc., et al. v. Chrysler Corporation, et al.,* throughout most of the summer and fall of 1974. With the exception of one deposition, that of Marvin Greenfield, Chrysler's discovery in the 1973 action was confined to obtaining documents from Greenfield and his related entities, either in the form of requests for the production of documents or written responses to interrogatories.

In late June or early July, 1974, Chrysler served on Greenfield a notice of deposition which included a request for the production of all documents which he had "in his possession or under his control" relative to the allegations of his complaint. Greenfield did not produce any of the requested documents when he appeared for the deposition on July 19, 1974. On July 26, 1974, Motors' attorney, Frank F. Roberson, wrote to Greenfield's attorney specifying certain documents which Chrysler wanted to copy.

When Greenfield had located and collected records and materials in his possession, the parties arranged for the inspection and copying of these records by Chrysler on August 15, and 16, 1974. On these dates, Bruce R. Lockwood of Motors, Ed Romerowicz, a representative from Credit, and Burt M. Kahn, on behalf of Greenfield and Superior, met for production of the documents which Chrysler had requested and Greenfield had uncovered. The Motors and Credit representatives accordingly began photographing the documents produced. After two days of inspection and copying, there remained further documents to be photographed, and an additional day for production was arranged by the parties for September 12, 1974. On this date, Chrysler completed inspection of the documents produced, and but for a small number of bound volumes which could not be reproduced by the copying device which Chrysler employed, all the documents were photocopied. With certain minor exceptions, the production of documents by Superior and Greenfield was thus completed.

Throughout this discovery period, Chrysler made no formal effort to compel production of documents which had been requested by them but which had not been provided by Greenfield and Superior. Chrysler did informally notify Greenfield that certain requested documents had not been produced, and, through his attorneys Greenfield responded that he had provided all the materials available which were requested by Chrysler.

On the eve of the trial of this action, Chrysler served on Greenfield a subpoena

duces tecum requiring the production at trial of an extensive list of documents. Greenfield's attorneys immediately moved to quash the subpoena on grounds that some of the documents requested had, to the belief of Greenfield and his attorneys, already been produced and that production of other documents would be burdensome while Greenfield was on the stand testifying. The Court denied the motion, but requested counsel to resolve the matter informally and bring any unresolved questions to the attention of the Court for arbitration. The record of the trial in the 1973 action reflects that the subpoena was never again brought to the Court's attention, and on the basis of testimony presented in the present action, it was not further pursued by plaintiffs' counsel.

### 2. The Trial in the 1973 Action

On November 18, 1974, the litigation proceeded to trial. Prior to the selection of the jury, the Court severed the anti-trust counts of the complaint (Counts VII, VIII, and IX) for separate trial subject to further proceedings. Accordingly, the parties adduced proof relative to Counts I through VI of the complaint.

In addition to offering proof in support of their allegations of wrongdoing on the part of Chrysler, Greenfield and Superior also presented an expert witness on damages, Dr. Richard Staelin, a Professor of Business Administration and Marketing at Carnegie-Mellon University. Dr. Staelin testified as to the profitability of the Superior dealership through a comparative analysis of the earnings of Suburban Dodge, Greenfield's Virginia dealership, Larry's Dodge, the dealership which succeeded Greenfield at the Superior location, and Central City Dodge, the nearest Dodge dealership competing with Superior.

Because Greenfield and Superior did not divulge the identity of their expert until shortly before trial, the proceedings were recessed by the Court for two trial days and a weekend following the direct examination of this witness to permit Chrysler to prepare its cross-examination. On the day of Staelin's cross-examination, December 9, 1974, Greenfield and Superior introduced as trial exhibits the documents upon which Staelin had premised his conclusions.

Chrysler generally denied Greenfield's imputation of wrongdoing, contesting Greenfield's evidence showing Superior to be a profitable concern, and questioning the adequacy of the capital structure of Greenfield's dealerships in Virginia and Baltimore.

On December 18, 1974, after fifteen days of testimony and one full day of argument, the jury returned a verdict finding Motors and Credit liable to Greenfield and Superior in the amount of $481,600, with 24% of this sum to be awarded to Superior and the remaining 76% to Greenfield. On December 30, 1974, a judgment consistent with the jury's finding was entered. In January, 1975, Motors and Credit moved for judgment n. o. v., and on May 25, 1975, the Court granted this motion only as to the recovery awarded Superior.

The parties filed cross appeals of the judgment entered by the Court, and on July 26, 1976, the Court of Appeals for the Fourth Circuit affirmed the judgment in part and vacated it in part. *See Superior Dodge, Inc. v. Chrysler Corporation*, 538 F.2d 616 (2d Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 754 (1977). The Court of Appeals rejected numerous arguments concerning asserted errors raised by Chrysler, including the argument that the evidence was insufficient to sustain the verdict. In addition, the Court of Appeals reversed the order of this Court granting the motion of Motors and Credit for judgment n. o. v. as to the recovery awarded Superior. Credit and Motors subsequently applied for certiorari review of this decision by the Court of Appeals to the Supreme Court. On January 10, 1977, the Supreme Court denied Chrysler's petition for a writ of certiorari, and the very next day, Chrysler filed the present action.

### B. THE PRESENT ACTION FOR FRAUD

More than two years after the judgment was entered in the original case and one

day after it was denied review by the Supreme Court, Chrysler as the successor to Motors and Credit, filed a complaint which charged that Greenfield and Superior had engaged in an unconscionable scheme to deprive Motors and Credit of information critical to their defense of the 1973 action. Chrysler accordingly sought to have the judgment which had been previously entered in the earlier case and affirmed by the Court of Appeals, set aside on grounds of fraud.

For more than two years following the filing of its complaint, Chrysler engineered a massive discovery effort aimed at disclosing relevant proof of the scheme alleged. The docket sheet of this action notes that Chrysler conducted over 40 depositions, in addition to filing literally hundreds of written interrogatories, and numerous requests for production of documents. On more than a few occasions, Chrysler has resorted to this Court to compel some form of discovery sought of the defendants, Greenfield and Superior. In stark contrast to Chrysler's discovery in the 1973 action, plaintiffs sought discovery from various third parties and resorted to a court outside of this District to compel discovery from various other sources.[2]

Following exhaustive pre-trial discovery, this action proceeded to a court trial on April 2, 1979. The testimony concluded sixteen days later on April 18, 1979, after the Court had heard evidence from 15 witnesses. The parties continued to designate documentary exhibits for another two weeks after which time, the evidence closed.[3]

## II. THE PLAINTIFFS' CLAIMS

When this action was originally filed, the plaintiffs alleged that Greenfield was involved in a widely ranging scheme which included the withholding of certain documents, the outright falsification of others, and the intimidation of certain witnesses. In the case of several of the business records of Superior Dodge, Chrysler maintained that records were withheld from production on the false premise that they had been stolen by a former Superior employee who had been suspected of embezzlement. Plaintiffs also alleged that documents were falsified by Greenfield personally or at his direction, while his employees were pressured to conceal from Chrysler the circumstances of this scheme.

Plaintiffs maintained that the withheld or unfalsified evidence would show that Greenfield was guilty of transferring assets from Superior to another of his enterprises, the United Acceptance Corporation (hereinafter "UAC"), at a time when Superior was in desperate need of cash. Other evidence would supposedly depict an entirely different view of the financial condition of both Greenfield and Superior than was presented at the earlier trial, allegedly proving that cause of Superior's failure was Greenfield's misconduct of the dealership and not Chrysler's asserted misconduct toward Greenfield.

As this case proceeded to trial, plaintiffs refined their allegations of Greenfield's fraud to focus primarily on the charge that Greenfield wrongfully withheld documents critical to Chrysler's defense in the earlier action. Chrysler categorizes the withheld documents as follows: [4]

(1) Documents relating to the operation of Suburban Dodge;

(2) Documents relating to UAC's transactions with Suburban and Superior;

(3) Documents relating to Greenfield's personal financial status and liquidity; and

(4) Documents relating to the unaccounted for disposition of used cars from the inventory of Superior Dodge.

---

2. See, e. g., Chrysler Corp. v. Superior Dodge, Inc., Misc. Docket No. 1223, which was brought in the United States District Court for the District of Columbia to compel discovery by the Security National Bank, Frederick Daum, and Warren L. Love, in reference to certain banking records concerning Greenfield's personal finances.

3. The Court's ruling on the admissibility of exhibits designated by the parties following the close of testimony will be given in a separate Order.

4. See Post-Trial Brief of Plaintiffs, at p. 51.

If these documents had been available in the earlier proceeding, Chrysler contends that it would have been able to demonstrate the following facts relevant to the disposition of that case:

(1) That Suburban was not nearly as profitable in 1969 as defendants represented, and that Suburban's operation experienced a sharp downward trend in 1970 and faced the prospect of larger losses not higher profits;

(2) That Greenfield was strangling the fledgling business of Superior by diverting its assets into UAC and that Greenfield caused ten conditional sales contracts worth $11,840 to be assigned to UAC, yet Superior received only $823.68;

(3) That Greenfield had substantial liquid capital available for investment in Superior; and

(4) That Greenfield was appropriating the assets of Superior for his own personal wholesale used car business.

## III. THE LEGAL BASIS FOR RELIEF

Rule 60(b), F.R.Civ.P., provides for equitable relief from a judgment or order in certain prescribed circumstances. Such equitable relief from a judgment is generally available on the following grounds within one year of the date on which the judgment had been entered:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); [and]

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party. . . .

The authors of the rule expressly declined to "limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding

. . . ." See Carr v. District of Columbia, 177 U.S.App.D.C. 432, 441–42, 543 F.2d 917, 926–27 (1976); Lockwood v. Bowles, 46 F.R.D. 625, 629 (D.D.C.1969); 7 Moore's Federal Practice ¶ 60.31 (2d ed. 1975); Wright & Miller, Federal Practice and Procedure: Civil § 2868 (1973).

■ Historically, courts of equity had authority to reform judgments in special circumstances. Carr v. District of Columbia, 177 U.S.App.D.C. at 441, 543 F.2d at 926. Equitable relief by independent action,

. . . has been granted, on the ground that, by some fraud practiced directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to court.

United States v. Throckmorton, 98 U.S. 61, 66, 25 L.Ed. 93 (1878). The Throckmorton Court however, proceeded to draw a distinction between the above described fraud, which would support relief in an independent action, and a species of fraud which would not, stating:

On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed. [Id.]

An understanding of the distinction drawn in Throckmorton was complicated by the Supreme Court's subsequent holding in Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870 (1891), in which the Court appears to hold contrary to Throckmorton, that an adverse party's use of an allegedly fraudulent contract was by itself sufficient to upset a previously entered judgment. In later cases, the Court failed to note conflict between the two decisions, see, e. g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), and indeed, the Court in Marshall v. Holmes, supra, cited Throckmorton with approval. 141 U.S. at 596, 12 S.Ct. 62.[5]

---

5. In Graver v. Faurot, 76 F. 257 (7th Cir. 1896), cert. dism'd, 162 U.S. 435, 16 S.Ct. 799, 40 L.Ed. 1030 (1896), the Circuit Court, noting a

possible conflict between the holdings in United States v. Throckmorton and Marshall v. Holmes, sent this case to the Supreme Court on

Despite the uncertainty which may prevail in some circuits concerning the vitality of the *Throckmorton* doctrine, *see Schum v. Bailey*, 578 F.2d 493, 506 (3d Cir. 1978); *Publicker v. Shallcross*, 106 F.2d 949, 950 (3d Cir. 1939); *Graver v. Faurot, supra*; the *Throckmorton* test remains the law in the Fourth Circuit. *See Durham v. New Amsterdam Cas. Co.*, 208 F.2d 342, 345 (4th Cir. 1953); *Aetna Casualty & Surety Co. v. Abbott*, 130 F.2d 40, 43–44 (4th Cir. 1942); *Prickett v. Duke Power Company*, 49 F.R.D. 116, 118 (D.S.C.1970) (Russell, J.). The question therefore presented by the plaintiffs' claim concerns the proper application of this principle.

Embodied in the *Throckmorton* distinction are two conflicting concerns: (1) a deep-rooted policy in favor of the finality of judgments and (2) the equitable consideration that it is manifestly unconscionable to permit enforcement of a judgment resting on after-discovered fraud. *See Hazel-Atlas Company v. Hartford-Empire Co.*, 322 U.S. at 244–45, 64 S.Ct. 997. In order to ascertain the significance of the distinction between so-called "extrinsic" and "intrinsic" fraud in the context of the relief provided by Rule 60(b), it is necessary to identify the equitable considerations which would warrant upsetting a judgment on grounds of fraud. First, proof of fraud undermines general confidence in the correctness of the outcome of a case. Thus, enforcement of a fraudulently obtained judgment is inherently unfair because the factual record supporting the judgment may be infirm. Second, the circumstance of the fraud may itself involve an abuse of the judicial process which a court could not tolerate. Thus, unless it prevents execution of the judgment entered, the court would permit the offending litigant, who most directly benefits from entry of the judgment, to be rewarded with the very prize his misconduct was designed to achieve.

■ The grounds for relief identified in Rule 60(b)(1)–(3) directly reflect the former concern for the accuracy of the findings supporting the judgment from which relief is sought. In the circumstances there identified, the rule would permit relief where it is shown that the judgment in question rests on excusable error, *see* 7 *Moore's Federal Practice* ¶ 60.22; Wright & Miller, *supra*, § 2858; where new evidence is discovered which calls into question the findings supporting the judgment, *see* 7 *Moore's Federal Practice* ¶ 60.23; Wright & Miller, § 2859; or where there is proof of fraud, however characterized, or misconduct by an adverse party, *see* 7 *Moore's Federal Practice* ¶ 60.24; Wright & Miller, *supra*, § 2860. Under Rule 60(b), a judgment is invulnerable to attack on such grounds once it has lapsed for more than a year as has the judgment involved in the present action. Consequently, the rule reflects a determination that ordinary equitable concerns about the execution of a judgment premised upon a factually assailable record will be permitted to prevail over a policy favoring finality of the judgment for no more than one year after the judgment has been entered.

■ The next question is whether, in an independent action to reform a judgment on grounds of fraud, relief is compelled on the basis one or both of the two identified equitable concerns, namely avoidance of an unwarranted outcome because of error or new proof, or the deterrence of misconduct on the part of a party to influence deliberately the outcome of a case by fraud. Assuming, as the Court must, that the distinction drawn by *Throckmorton*, between the species of fraud which will preclude equitable enforcement of a judgment and that species which will not, is a meaningful one, equitable interposition in an independent action can be justified only on the basis of deterring an adverse party from resorting to improper means to obtain a judgment.

■ The equitable relief available to an aggrieved party in an independent action "rests on 'stringent' rules limited to circumstances 'which render it manifestly

a certificate of importance, apparently in hope that the noted conflict might be resolved. The Supreme Court however refused to hear the case on the merits, dismissing the certification of importance as invalid. *See* 7 *Moore's Federal Practice* ¶ 60.37[1], at 616, n. 28.

unconscionable that a judgment be given effect.'" *Carr v. District of Columbia*, 177 U.S.App.D.C. at 442, 543 F.2d at 927; *Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 333, 463 F.2d 268, 279 (1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972), *quoting* 7 *Moore's Federal Practice* ¶ 60.37[1] at 623. *See also Dictograph Products Company, Inc. v. Sonotone Corporation*, 230 F.2d 131, 137 (2d Cir.), *cert. dism'd*, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956). However, in making that determination of manifest unconscionability, courts focus on deliberate and purposeful misconduct on the part of a litigant which is designed specifically to subvert the fact finding process by defeating full presentation of the adversary's case.[6] *See United States v. Throckmorton*, 98 U.S. at 65–66, 25 L.Ed. 93; *Chicago, R.I. & P.R. Co. v. Callicotte*, 267 F. 799, 809–10 (8th Cir. 1920), *cert. denied*, 255 U.S. 570, 41 S.Ct. 375, 65 L.Ed. 791 (1921); *Pickens v. Merriam*, 242 F. 363, 372 (9th Cir. 1917); 7 *Moore's Federal Practice* ¶ 60.37[1] at 617–

18. *Cf. England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960); *United States v. Standard Oil Co. of Calif.*, 73 F.R.D. 612, 615 (N.D. Cal.1977); *Lockwood v. Bowles*, 46 F.R.D. at 631 (In an action to set aside judgment for fraud on the court "it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.")

In order to prevail in an independent action, an aggrieved litigant must prove certain "essential" elements: (1) a judgment which ought not be enforced in equity and good conscience; (2) a good defense to the alleged action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant from obtaining benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any remedy at law. *Bankers Mortgage Company v. United States*, 423 F.2d 73, 79 (5th Cir.), *cert. denied*, 399 U.S. 927, 90 S.Ct.

---

**6.** Under the *Throckmorton* doctrine any fraud which relates to the validity or authenticity of evidence presented at the trial of an earlier proceeding will not by itself warrant the setting aside of the judgment. Such fraud is commonly denoted as "intrinsic," and courts applying the *Throckmorton* doctrine will not consider it a basis for affording equitable relief from a judgment. While it is generally accepted that perjury or the falsification of a document represent instances of intrinsic fraud, the question of when, if ever, such misconduct would ever warrant equitable relief is more problematic. By itself, proof that a witness perjured himself or that a document had been falsified is no different from the discovery of new evidence which impeaches the integrity of the record supporting the judgment from which relief is sought. Under the provisions of Rule 60(b), relief for such fraud in the guise of an independent action ultimately renders meaningless the one-year limitation otherwise applicable to actions for relief from a judgment on such grounds as newly discovered evidence. *See Kupferman v. Consolidated Research and Manufacturing Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972); 7 Moore's Federal Practice ¶ 60.33 at 511.

On the other hand, proof that the use of fraudulent evidence in an earlier action was part of a deliberate scheme involving an adverse party to influence the outcome of that proceeding is evidence "extrinsic" to the proof adduced in the earlier action which not only impugns the integrity of the facts supporting

the judgment in question but links this infirmity to misconduct by a litigant which equitable interposition may ultimately redress. *See Chicago, R.I. & P.R. Co. v. Callicotte*, 267 F. at 809–10 (8th Cir. 1920), *cert. denied*, 255 U.S. 570, 41 S.Ct. 375, 65 L.Ed. 791 (1921). *But see Lockwood v. Bowles*, 46 F.R.D. 625 (D.D.C. 1969).

It is generally accepted that the rationale of a distinction between "extrinsic" and "intrinsic" fraud is that the latter is often "discoverable through the ordinary processes of the trial itself, such as the right to cross-examine . . .." *Lockwood v. Bowles*, 46 F.R.D. at 630. While the use of fraudulent evidence is often problematically and inflexibly classified as "intrinsic" regardless of the circumstances in which it was produced, Professor Moore suggests that a "more reasonable course" would be to focus less rigidly on the fact that the evidence in question was presented at trial and instead consider the diligence with which the fraud was discovered and acted upon. 7 *Moore's Federal Practice* ¶ 60.37[1] at 618. In this case, where the allegations concern evidence which was never presented at the earlier trial supposedly because it had been fraudulently suppressed by defendants, no such problem arises with respect to whether the fraud alleged is "extrinsic" or "intrinsic". However it is considered, the fraud alleged in this action is "extrinsic." *See Chicago, R.I. & P.R. Co. v. Callicotte, supra*.

2242, 26 L.Ed.2d 793 (1970); *Chicago, R.I. & P.R. Co. v. Callicotte*, 267 F. at 810. Bearing in mind these prerequisites, it is thus incumbent upon the plaintiffs in this action to present favorable proof of these factual issues by clear and convincing evidence at trial:

(1) Did Greenfield and Superior disclose subsequent to the 1974 trial documents which were material to the defense of Motors and Credit in the earlier action, and did the unavailability of these materials prevent Motors and Credit from fully and fairly presenting their defense?

(2) Did Motors or Credit specifically request production of the documents allegedly withheld and did the plaintiffs pursue production of the documents with due diligence? and

(3) Did Greenfield and Superior deliberately withhold production of the identified documents for the purpose of preventing Motors and Credit from presenting a full defense of the earlier action?

*See generally Atchison, Topeka and Santa Fe Railway Co. v. Barrett*, 246 F.2d 846, 849 (9th Cir. 1957); *United States v. Standard Oil Co. of Calif.*, 73 F.R.D. at 615–16.

## IV. PLAINTIFFS' PROOF AT TRIAL

### A. THE SIGNIFICANCE OF THE NEWLY DISCOVERED DOCUMENTS

The plaintiffs have identified four categories of documents which have become available since the trial in the 1973 civil action and which allegedly would have aided Credit and Motors in their defense of that action. These newly discovered materials include: (1) documents relating to the operation of Suburban Dodge; (2) documents relating to UAC's transactions with Suburban and Superior; (3) documents relating to Greenfield's personal financial status and liquidity in 1974; and (4) documents relating to the disposition of used cars from the inventory of Superior Dodge.

### (1) The Suburban Dodge Records

Plaintiffs maintain that these business records are the most significant of the newly discovered documents. According to plaintiffs, these records demonstrate not only that Greenfield's Manassas dealership was anything but profitable prior to his move to Baltimore, but that the capital structure of the Baltimore dealership was grossly inadequate.

Plaintiffs assert that the profitability of Suburban and the adequacy of Superior's capitalization were critical issues in the earlier trial. Arguably, the financial prospect of Suburban was an important factor in appreciating the motivations which prompted Greenfield's move to Baltimore, while the adequacy or inadequacy of Superior's capital structure is a significant consideration in assessing the cause of Superior's business failure.

The only question these records raise concerns the valuation of certain used cars which were originally part of the inventory of Suburban Dodge and later transferred to Superior, forming a substantial portion of Greenfield's capital contribution to the Baltimore dealership. These documents allegedly relate to the question of Suburban's profitability because the expert who testified on behalf of Greenfield and Superior at the original trial indicated that the reported earnings of Suburban were distorted by certain tax motivated adjustments which resulted in Suburban substantially understating on its books the "true" value of its used car inventory. Plaintiffs maintain that these new records warrant reconsideration of the assumptions upon which it is alleged the defendants' expert testified in the earlier proceeding as to the profitability of Suburban. Moreover, plaintiffs insist that the new evidence entirely refutes the expert's earlier testimony that Suburban was a thriving enterprise.

The documents in question include (1) a so-called "journal voucher," dated January, 1970, which summarizes accounting adjustments concerning among other things, used cars and trucks transferred to Superior (Plaintiffs' Exhibit No. 221A); (2) an un-

dated inventory list of used cars at Suburban with a covering note apparently from former Suburban bookkeeper Judy Settle to Marvin Greenfield asking Greenfield to designate the vehicles to be written down for transfer to Superior (Plaintiffs' Exhibit No. 221B); an inventory list dated January 31, 1970 which details the used cars at Suburban which were designated for transfer to Superior by Greenfield at a specified value (Plaintiffs' Exhibit No. 221C); and a copy of certain "journal entries" from the records of Suburban Dodge, dated August 31, 1969, which includes on its second page a notation of certain write-downs in the value of used cars and trucks at Suburban (Plaintiffs' Exhibit No. 259).

Not all of the information contained in these newly discovered documents is in fact information which was not available at the original trial. On the day that Dr. Staelin, the defendants' expert, was to be cross-examined, the defendants introduced several exhibits upon which the expert based his testimony, including a Suburban list of its used car inventory (Plaintiffs' Exhibit 22). Consequently, the only information which is relevant to the plaintiffs' present claim is data included on the now available documents which are absent from the inventory list made available at the earlier trial. This genuinely new information includes figures on the initial cost of each listed used vehicle, reconditioning costs incurred, and a figure which represents a value at which the cars may have been carried on Suburban's books at some unspecified time. In addition, it is stated in one of the "journal entries" dated August 31, 1969 (*See* Plaintiffs' Exhibit No. 259), at which time Suburban had been in business for a year, that Suburban's used car and truck inventory had been written down by more than $18,-000. As did the inventory list made available in 1974, these new documents reflect the value at which the inventory was transferred to Superior Dodge and the extent to which the inventory was encumbered by Chrysler financing.

The critical question raised by the plaintiffs is whether the value at which this inventory was carried on the books of Suburban and later transferred to Superior represents a fair market value of the vehicles, or merely a tax motivated understatement of fair market value. From the purportedly new evidence available, absolutely nothing can be inferred which refutes Dr. Staelin's assumption at the original trial that the Suburban inventory was valued at substantially below fair market value. Indeed, not even the plaintiffs rely on any of the documentary evidence now available to support their position. Rather, plaintiffs cite certain comments made by Greenfield in a deposition taken in October, 1977, which suggests that he used a Red Book as well as his professional judgment to value his inventory at wholesale value.[7] However, these comments are subject to question as Greenfield testified throughout the present trial that his valuations were "ultra, ultra conservative." Moreover, Greenfield clearly contradicted the import of his cited comments earlier in the same deposition upon

---

**7.** Plaintiffs cite in support of their position the following testimony of Greenfield concerning the significance of certain figures on Suburban's January, 1970 monthly used car inventory (Plaintiffs' Exhibit No. 221C or Defendants' Exhibit No. 90 (original)), at p. 1122, Greenfield Deposition, October 9, 1977 (Docket Entry No. 314):

Q. Well, the figures that are in your handwriting, you said that they represented your professional opinion on value.
A. Yes.
Q. When you say value, do you mean wholesale value, retail value, fair market value? What kind of value did the figures that you wrote down on Greenfield Exhibit 16 represent?
A. Wholesale
Q. And did the figures that you wrote down represent—did the figures you wrote down on Greenfield Exhibit 16 represent your opinion as to value at the time you wrote the figures down?
A. I don't understand what you mean.
Q. Well, when you wrote them down, at the time you wrote them was that the value that you thought those cars had at the time you wrote it?
A. In other words, I believed, that was not only my opinion, but there is a Red Book also that was used.

which plaintiff now relies where he indicated that the market value of his inventoried vehicles could be worth substantially more than the value at which they were carried on his books.[8] In the final analysis, the plaintiffs have developed no new evidence showing that the value of the Suburban inventory was incorrectly assessed at the 1974 trial, and further, plaintiffs have presented no probative evidence, old or new, refuting the defendants' assertions in the earlier proceeding.[9]

Similarly, the new evidence plaintiffs have managed to uncover has little or nothing to do with the analysis of Suburban's profitability performed by Thomas P. Bintinger, plaintiffs' expert in this action. He concludes that contrary to Dr. Staelin's analysis, Suburban would not have netted a profit of more than $80,000 had it completed fiscal year 1969–70, but rather would have experienced severe losses of tens of thousands of dollars. However, even had plaintiffs succeeded in proving by evidence now available that Suburban's used car inventory was not undervalued for tax purposes, this evidence would not account for the incredibly vast divergence of opinion between Bintinger in this action and Staelin in 1974 respecting the 1969–70 earnings of Suburban Dodge. Although Bintinger may

follow the same methodology employed by Staelin, he very clearly has not used the same source documents to begin his analysis of the earnings of Suburban. Where Staelin begins his analysis by reference to the reported $11,671 net earnings for that year to date, reflected in the last monthly financial report prepared by Suburban in 1969–70, Bintinger relies in his analysis on the Suburban Dodge tax return for this period which reported a tax loss in excess of $46,000. Thus, the expert's very choice of Suburban's financial report or its tax return as the basis for his analysis of the dealership's yearly earnings has a determinative initial impact on the conclusion ultimately reached which reflects the more than $57,000 difference between the earnings reported in the two documents.

Both the financial reports of Suburban and its tax returns were available at the original trial.[10] The question of which document may more accurately reflect the financial condition of Suburban Dodge in 1970 is not a matter for litigation in this action, unless the plaintiffs can point to newly available evidence allegedly suppressed by the defendants in 1974 which clearly and convincingly shows Staelin's reliance upon the financial reports to be un-

8. Ten pages earlier in the Greenfield Deposition of October 9, 1977, Greenfield testified as follows concerning the value of one representative vehicle carried on the Suburban used car inventory list (Plaintiffs' Exhibit No. 221C):

Q. Would you explain what the meaning of the $125 under the W/D for stock No. 157 is?

MR. LAAKE: That question has been asked and answered I know at least two times previously, Mr. Ehrenbard. I will ask him to answer it again.

A. I will be glad to answer it again for you. That car was written down from 150 to 125.

Q. In other words, you are saying that the car—

A. That doesn't necessarily mean that car is worth $125. That car very well could be worth $500.

9. Indeed, the proof which the plaintiffs have offered tends to confirm the correctness of Dr. Staelin's assumption that the Suburban inventory was carried on the books at a value substantially below its fair market value. According to plaintiffs, Greenfield determined the value at which used cars would be reported on his

books using fundamentally the same reference which Dr. Staelin used to determine the "real" value of the Suburban inventory transferred to Superior, namely the so-called "Red Book." Not even allowance for understandable differences of opinion or the fact that Greenfield's valuation had the benefit of a visual inspection of the vehicles would account for the difference between Greenfield's purportedly true valuation of roughly $52,000 and Dr. Staelin's "conservative" estimate in excess of $80,000. If Greenfield did use a Red Book to assist him in determining the recorded value of his inventory, it was apparently used to assist him in making an "ultra, ultra conservative" valuation far below fair market value.

10. The tax returns of Suburban Dodge and any financial statement of the dealership which Chrysler would not otherwise have were produced by Greenfield during discovery for the 1974 trial. See Receipt of Documents— 9/12/74—signed by Robert Lockwood (Defendants' Exhibit No. 4).

warranted. No such evidence has been presented.

Accordingly, the Court must find that plaintiffs have presented no new evidence, withheld or otherwise, which now demonstrates that Greenfield's capital contribution to Superior in used cars was inaccurately overvalued or that Suburban Dodge was on the verge of financial collapse.

### (2) The UAC Records

Plaintiffs maintain that there are now available documents that were unavailable at the earlier trial which effectively show that Greenfield operated the United Acceptance Corporation as a "corporate leech," used by him to drain off valuable income generating assets of Superior. Plaintiffs argue that these documents are relevant as evidence of a decision by Greenfield to liquidate Superior.

The documents in question consist of UAC records which detail the collection by UAC on individual accounts receivable originally belonging to Superior (Plaintiffs' Exhibits No. 27–62). The evidence undeniably shows that Greenfield used UAC as a collection agency. In some cases, Superior sold conditional sales contracts to UAC, while in others, Greenfield explained, an informal relationship existed whereby UAC would collect payments on behalf of Superior and keep for itself a percentage of the proceeds. In reality, the two collection procedures were indistinguishable. However, the relevant issue is not the regularity or irregularity of Superior's relationship with UAC, but whether, through this relationship, Greenfield was able to siphon off substantial assets of Superior so that when the dealership experienced critical cash flow problems in the summer and latter part of 1970—in part due to actions taken by Motors and Credit—its failure was already assured.

The records now available reflect the sale by Superior of five conditional sales contracts to UAC, the referral of 10 so-called "memo" accounts to UAC for collection, and the referral of 8 "side notes" to UAC for collection. The face value of the five sales contracts sold to UAC totalled $3,744.30, on which UAC collected in full in 1970, paying to Superior all but $445, which it retained as a return on the transaction. More than $12,000 in "memo" accounts were referred by Superior to UAC, on which UAC collected payments of $3,632.03 in 1970. However, UAC paid Superior only $823.68, less than a fourth of the amount collected in 1970. Finally, Superior referred "side notes" in the amount of $1,249.62 to UAC, which collected $892.24 on these accounts in 1970. Only $310 of this collected amount was turned over to Superior. In all, this evidence shows that UAC failed to pay Superior roughly $3,000 in cash collected on Superior's receivables. This cash was not made available to Superior before the dealership closed its doors at the end of 1970.

Because UAC· is a Greenfield-affiliated entity, UAC's retention of the funds collected on behalf of Superior is relevant in assessing responsibility for the cash flow problems which Superior experienced months after it began operating and which contributed greatly to its failure. Consequently, UAC's retention of cash belonging to Superior supports the contention of Motors and Credit at the original trial that Greenfield, not Motors, caused the failure of Superior. Yet, the actual amount of cash retained by UAC,[11] is hardly substantial when compared to Superior's extensive need for capital to acquire additional new cars after it lost Chrysler financing in 1970. Accordingly, while this allegedly "new" evidence may be material to a defense available to the plaintiffs in the earlier trial, it is only marginally so, in view of the relatively small amount of money involved.

### (3) Greenfield's Personal Financial Records

Plaintiffs maintain that personal bank records of Marvin Greenfield were not made available in the 1973 civil action, and

---

11. Contrary to the implied contention of plaintiffs, the referred accounts do not represent liquid assets, since only when payments had been made on the contractual obligations in question, did Superior's so-called "memo" accounts became liquid, and only to the amount of the payments rendered on the account, in this instance, approximately $3,000.

on the basis of bank records now available, plaintiffs argue that Greenfield had substantial liquid capital available for investment in Superior. At the original trial, when asked whether he could have borrowed the $93,000 that Credit demanded he contribute to Superior as a condition of its continued financing, Greenfield replied, "I don't believe I could have . . ." (Transcript of proceedings, 1974 trial at pp. 420–21).

Arguably, evidence of Greenfield's ability to contribute financially to Superior's operation is relevant in view of Greenfield's failure to make capital contributions to the business which Credit had demanded he make. However, the significance of this evidence must be tempered with a consideration of whether, given not only Greenfield's financial condition but also the circumstances of his dealings with Chrysler, his failure to make added capital contributions to the dealership constituted an act of bad faith on his part.[12] Notwithstanding the allegations of the complaint in the 1973 action, that he "devoted all of his . . . monies" to the operation of Suburban, the Court is aware of no obligation, other than the provisions of Greenfield's agreements with Chrysler, which would have required him to provide additional capital for Superior. Accordingly, to the extent that Greenfield's financial liquidity in 1970 may have been probative in the 1974 trial as one of several factors which could be considered in assessing Greenfield's good faith commitment to the success of Superior,[13] the Court cannot conclude that this newly available evidence would have merely a cumulative impact on the evidence earlier presented.

### (4) Record of the Unaccounted for Used Cars

Plaintiffs indicate that, through several records obtained subsequent to the original trial, they have been able to document the apparent diversion of forty-four used cars from Superior having a book value of $35,373.28. According to the plaintiffs, this new evidence supports the contention that during the entire period that Superior was in operation, Greenfield was gradually phasing into the wholesale used car business which latter became J & B Imports, another Greenfield enterprise. Plaintiffs argue that this evidence shows Greenfield ready "to jettison" Superior when the opportunity arose and move full-time into the more lucrative wholesale business.

The relevant documents allegedly available only after trial of the 1973 action include: (1) several used car inventories of both Superior and Suburban (Plaintiffs' Exhibits 19, 211B and 221C); and (2) certain cancelled checks of Superior (Plaintiffs' Exhibits No. 1F and 2). In addition to these materials, plaintiffs' expert Thomas Bintinger, who testified relative to the used car analysis he performed on the records of Superior, stated that he also relied upon the general ledger of Superior Dodge, and sales journals, the cash disbursements and purchase journal, and the general journal all of which were made available at trial of the original action.[14] Yet plaintiffs now insist that but for the recent availability of several inventory lists and certain obscure references on a handful of cancelled checks, evidence that a number of used cars were unaccounted for on the books of Superior could not have been developed prior to the close of testimony at the earlier trial.

This contention is rendered entirely untenable by the presence of a used car analysis which is substantially similar to the analysis offered in this action among the workpapers of one of Chrysler's experts who assisted in preparation for the 1974

---

12. *See* Dealers' Day in Court Act, 15 U.S.C. § 1222.

13. Under the Dealers' Day in Court Act, an automobile manufacturer may, for instance, in good faith require that a dealer carry out a contractual obligation to abide by reasonable net capital guidelines, and whether the manufacturer has so acted in good faith is a factual question the determination of which will depend on the facts of each given case. *Rea v. Ford Motor Company*, 497 F.2d 577, 585 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).

14. *See* Receipt of Documents (Defendants' Exhibit No. 4).

trial. By tracing the disposition of used cars reported in Superior's new car sales journal as trade-ins through the used car sales journal, Bruce Lockwood was able to discern in 1974 that there were 37 used cars unaccounted for on the books of Superior. However, Lockwood was never called upon to testify in the original trial because Motors' attorneys believed that his testimony would be merely cumulative to the testimony of another Chrysler expert, and because Lockwood was believed not competent in courtroom appearances. Consequently, Lockwood's used car analysis was never brought to light at trial until the present action.

While it may appear that the various documents recently made available assisted in the used car analysis performed in the present action on behalf of plaintiffs,[15] Lockwood's analysis in 1974 clearly evidences that the documents in question simply were not vital to making the kind of analysis attempted. Such a used car analysis was performed prior to the 1974 trial, it was available to plaintiffs, but it was just not used. Accordingly, the Court must find that the availability sometime after the 1974 trial of several used car inventories and certain cancelled checks contributes only cumulatively to other evidence available to plaintiffs in the earlier action relative to the unaccounted for disposition of used cars at Superior.

## B. PLAINTIFFS' EFFORTS TO SECURE PRODUCTION IN 1974

Prior to the 1974 trial, plaintiffs made four formal requests for the production of documents, including:

15. The Court cannot believe that the unavailability of Suburban used car inventories—which were, for purposes of the attempted used car analysis, of no greater significance than the inventory produced at trial (Plaintiffs' Exhibit No. 22)—and obscure references on cancelled checks had any effect at all of foreclosing development of this evidence in the earlier action. While the Superior used car inventory of October, 1970 (Plaintiffs' Exhibit No. 19) may have been useful, the Court is persuaded that this evidence is no more than cumulative, reflecting merely a neater compilation of facts elsewhere reported in the material which the defendants did produce during discovery in 1974.

(1) the Notice of Deposition to Greenfield requesting him to bring eight categories of documents;[16]

(2) a letter from Motors' attorney Frank F. Roberson to Greenfield's attorney Walter E. Laake specifying documents covered by the initial Greenfield production request which Chrysler wanted to examine;[17]

(3) a Rule 34 request for production of documents specifying nine categories of documents; and[18]

(4) Credit's trial subpoena duces tecum served on Greenfield the weekend before trial.[19]

In addition to these formal discovery efforts, Credit and Motors made several informal requests for documents, including a colloquy among counsel at the deposition of Charles Garber on September 18, 1974, a request by Credit attorney Fenton Martin to Greenfield representative Burt Kahn concerning inventory sheets in October, 1974, and a telephone conversation on December 4, 1974 between Kahn and Martin relative to the documents to which Greenfield's expert, Staelin, had referred in performing his analysis of the records of Suburban Dodge.

A review of Chrysler's various requests for documents warrants the following conclusions relating to Chrysler's efforts in 1974 to acquire copies of the various documents allegedly not produced for the earlier proceeding.

Chrysler did specifically request used car inventory lists for both Superior and Subur-

16. *See* Notice of Deposition (Defendants' Exhibit No. 1).

17. *See* Letter from Frank F. Roberson—7/26/74 (Defendants' Exhibit No. 2).

18. *See* Request for Production of Documents—Mailed 8/15/74 (Defendants' Exhibit No. 6).

19. *See* Subpoena Duces Tecum for Pltff. Greenfield served upon him at original trial (Defendants' Exhibit No. 8).

ban Dodge. The records were included, albeit vaguely, in item # 1 of Chrysler's production request embodied in the Greenfield Notice of Deposition. This request required Greenfield to produce "[t]otal, complete and original files relative to the operation and termination of . . . Suburban Dodge, Inc., . . . ." In addition, a request for "[a]ll new and used car . . . inventory records" for both Suburban and Superior was included in Chrysler attorney Roberson's letter to Walter Laake which elaborated on the earlier request for production made of Greenfield. The inventory sheets were at least implicitly requested at the Garber deposition held on September 18, 1974, at which time Credit attorney Martin expressed his interest in obtaining documents relative to Suburban assets brought over to Superior Dodge. Finally, Martin again requested production of inventory records in a communication with Burt Kahn, sometime in October, 1974.

Chrysler did not specifically request production of any record concerning Superior's or Suburban's transactions with UAC until on the eve of trial, when it served on Greenfield a subpoena duces tecum. The record of the 1974 trial clearly reflects that despite the Court's denial of a motion by Superior and Greenfield to quash the subpoena, and despite the Court's invitation to the parties to resolve matters informally subject to arbitration by the Court of unreconcilable matters, the subpoena was never again brought to the Court's attention. Further, the testimony adduced in the present action indicates that Chrysler's attorneys did not pursue production of the subpoenaed documents with the defendants' attorneys as the Court had suggested. Consequently, Chrysler exhibited every sign of having abandoned its effort to procure the documents requested in the subpoena duces tecum, and the Court finds that Chrysler failed to manifest due diligence in attempting to acquire the UAC records allegedly not provided for the 1974 trial.

Similarly, the only specific request by Chrysler that Greenfield produce certain personal banking records is contained in the previously discussed subpoena duces tecum served on the eve of trial, which, for all practical purposes, was subsequently abandoned by Chrysler. In addition, much of the evidence which the plaintiffs have presented in the present action concerning the liquidity of Greenfield in 1970 was obtained from third parties, such as the Security National Bank, without need to involve Greenfield in this discovery. In the original action, Chrysler's attorneys conducted no third party discovery. Accordingly, plaintiffs failed to pursue in 1974 the production of documents which they now claim to be essential to their original defense.

Finally, the Court has determined that plaintiffs specifically requested production of the used car inventories of Superior and Suburban which plaintiffs maintain were instrumental in developing evidence that [20] 41 used cars were unaccounted for on the books of Superior. However, plaintiffs did not specifically request production of the cancelled checks not provided in the earlier proceeding. The particular checks in question were drawn on the account of Superior Dodge, Inc. and were not therefore the "personal bank account statements and cancelled checks" requested by Credit in its subpoena duces tecum. Indeed, only by a generous reading of the vague terms of Chrysler's initial document request might it be suggested that a general demand had been made for production of every relevant financial document of Superior. Arguably, Superior's cancelled checks were such relevant documents; yet, in his letter to Walter Laake detailing the records that Chrysler was interested in copying, Chrysler attorney Roberson included check vouchers but omitted cancelled checks. After Chrysler apparently failed to discover available check vouchers, no one from Chrysler spe-

---

**20.** There is an apparent miscalculation with respect to the number of used cars determined by Bintinger not to be accounted for on the books of Superior. Instead of 44 vehicles, the Court counts only 41 used cars identified on the summary of the Bintinger analysis. (Plaintiffs' Exhibit No. 230).

cifically asked Greenfield or any of his representatives whether the cancelled checks of Superior were available. Accordingly, absent a specific request by plaintiffs of Greenfield to produce the cancelled checks of Superior and absent any effort by plaintiffs to procure production of the documents from third party sources, the Court must conclude that Chrysler failed to pursue the production of these documents.

## C. PLAINTIFFS' PROOF OF FRAUD

Plaintiffs have presented no direct evidence that Greenfield or his agents intentionally withheld requested documents for the specific purpose of defeating the defense of the earlier action. Rather, plaintiffs' proof is circumstantial, depending upon the following alleged factual predicates: (1) that certain requested documents (2) not provided in 1974 (3) were subsequently provided by the defendants. Underlying this circumstantial chain of proof are several necessary assumptions: (1) that subsequent production of a document necessarily implies its ready availability at an earlier date and (2) that the significance of the documents in question is so apparent on their face that a party who knowingly withheld the documents from his opponent may be imputed with knowledge of the effect that his action may have in preventing the opponent from successfully presenting his case.

Plaintiffs effectively contend that certain documents, which were not available for the 1974 trial, were requested prior to that trial, that defendants were aware that these documents were within the scope of the discovery request, that defendants failed to produce the documents when, contrary to their representations, the documents were available to them, and that the defendants knew of their availability yet failed to produce the documents in full knowledge of their value to the defense of the earlier action. Proof of these allegations would entitle plaintiffs to the equitable relief they seek from enforcement of the judgment won by the defendants. However, no such proof has been presented.

The Court has already determined that with the exception of certain used car inventories, none of the documents which plaintiffs allege to have been withheld was ever specifically requested *and* diligently sought in the earlier case. Defendants in significant part complied with the one discovery request which Chrysler did make with respect to allegedly withheld inventories when defendants offered the Suburban used car inventory (Plaintiffs' Exhibit No. 22) as evidence at the 1974 trial. While the evidence indicates that this inventory was not produced prior to the 1974 trial, plaintiffs had benefit of this document for roughly seven days until the presentation of evidence concluded. Moreover, the plaintiffs had not yet begun presenting their defense when the inventory was made available, and the late production did not place Motors and Credit in the concededly difficult position of having to reopen their case in order to utilize this new information. Despite plaintiffs' contention that the listing produced in 1974 was merely a "sanitized" version of other inventories which were not produced, the Court is not convinced that the unsanitized information contained in the inventories now available is any more material in proving either of plaintiffs' contentions that the value of Suburban's used car inventory was accurately reflected on its books or that used cars at Superior were improperly disposed of.

After reviewing the materials allegedly withheld, the Court has concluded that several of the documents, such as the Suburban records (Plaintiffs' Exhibits No. 221A, 221B, 221C, 259, contain no new information of any relevance to a defense available in the earlier action. Other documents, such as the UAC records (Plaintiffs' Exhibits No. 29–62) are at best marginally relevant while the Superior cancelled checks (Plaintiffs Exhibits No. 1F, 2) and inventories (Plaintiffs' Exhibits No. 19, 258) are merely cumulative. Indeed, the probative value of Greenfield's banking records, while not insubstantial, is difficult to assess. Consequently, the prejudicial significance of no one document allegedly withheld from

plaintiffs is especially manifest on its face. Thus, any inference that the defendants were necessarily aware of the impact on Chrysler's case of the various materials allegedly withheld is not warranted on the proof presented. Absent direct proof of purposeful conduct on the part of the defendants in failing to disclose the items in question, the Court cannot find that the defendants acted with fraudulent intent.

Finally, plaintiffs have produced no clear and convincing evidence that any document unequivocally requested was available prior to the 1974 trial and that Greenfield or any of his representatives knew of its whereabouts. Under ordinary circumstances it may be presumed that records and documents kept and maintained in the ordinary course of business would remain continually available to the operator of the concern for some time. It would follow that the disappearance and the sudden appearance of such records absent a credible explanation would raise a fair inference that the records had been manipulated.

However, the evidence presented in this case undercuts the general premise that business records are uniformly maintained in an orderly fashion. It is apparent from Greenfield's testimony that he did not trouble himself with maintaining the books of his dealership. In addition, Greenfield testified that his bookkeeper at Superior, Diane Stark, had left with certain records of the dealership when Greenfield and his accountant confronted her with their suspicions that she had embezzled company funds. Greenfield stated that since her departure, the books of Superior could never be reassembled. In addition, Robert Johns, the only witness not sympathetic to Greenfield who had experience with the books of Superior in 1970, indicated that the records were sloppily maintained. Finally, the records of the dealership were further disturbed on December 12, 1970, according to Greenfield, when United States Marshals executing a writ of replevin, issued on behalf of Chrysler, "cleaned out" nearly all movable items at Superior, possibly taking with them certain records, including the books of Suburban—which have not been located since—and leaving other records in a heap in the middle of the floor. Plaintiffs offer no convincing evidence that directly challenges these circumstances accounting for the general irregularity of Greenfield's records. Moreover, since neither Suburban nor Superior had been a going concern for several years when discovery commenced in 1974 neither enterprise had a continuing business interest in keeping and maintaining orderly records.

■ Greenfield began reassembling the records of his dealerships in August, 1974, in response to plaintiffs' initial document request contained in the Notice of Deposition plaintiffs had served on him. After gathering a collection of papers from a barn nearby his residence, Greenfield turned these documents over to his attorneys who after quickly sorting through the materials, apparently to remove extraneous documents, made available to the plaintiffs. The evidence reflects that the defendants' attorneys were not themselves fully aware of the documents they had or the significance these materials bore. Moreover, counsel were then and still are not entirely sure what documents they offered for production in 1974. The crucial question which these facts raise is whether certain clearly requested documents not provided prior to the 1974 trial were "unavailable" because of the irregular state of the defendants' records or because of some improper motivation on the part of the defendants. There has been presented on this point no clear and convincing evidence either way. In a circumstance such as this, where the plaintiffs have the burden of proof, the doubt must be resolved against them.

Accordingly, plaintiffs' proof of fraud is unconvincing. Plaintiffs have presented no clear and convincing evidence that the documents made available to the plaintiffs after the 1974 trial were not unavailable prior to the earlier proceeding as the defendants represented. In addition, plaintiffs have failed to convince the Court that the information conveyed by the documents subsequently produced was so significant on their

face as to raise a fair inference that the failure to produce the materials clearly evidences an intention to prejudice Chrysler's case in 1974.

## V. CONCLUSIONS

■ After reviewing the evidence presented in the trial of this action, the Court reaches certain conclusions with respect to each of the four categories of documents which plaintiffs maintain was withheld from discovery for the 1974 trial.

Chrysler requested production of the used car inventories of Suburban for purposes of its analysis of the correct valuation of these assets and the defendants provided a used car inventory at the 1974 trial. Moreover, the additional information contained in the inventories allegedly withheld is ultimately immaterial both to an assessment of the fair market value of the listed vehicles and to a refutation of the defendants' evidence of Suburban's profitability which was presented in the 1974 trial.

While the records of defendants' relationship with UAC and the personal banking records of Marvin Greenfield were material to the plaintiffs defense of the earlier action, these materials were never withheld in a real sense since plaintiffs did not diligently pursue production of the documents in 1974, notwithstanding its subpoena duces tecum served on Greenfield on the eve of trial. This document request was effectively abandoned soon after the trial began.

The inventories requested by Chrysler in connection with its analysis of the disposition of used cars at Superior were not vital to the kind of analysis attempted in 1974 by plaintiffs' accounting expert Bruce R. Lockwood. With respect to the cancelled checks which also allegedly aided in plaintiffs' analysis, the Court is satisfied that these documents were not withheld since they were never specifically requested.

Finally, and most importantly, the Court has determined that there has been presented no clear and convincing proof of a fraudulent scheme to withhold discovery in the 1974 action. While the evidence does show that defendants' production may not have been entirely forthcoming in response to Chrysler's discovery requests, the requests themselves were sometimes vague, and often the plaintiffs were less than diligent in following up requests for documents or fully employing the evidence made available. However, both sides have shown themselves in this case and in 1974 to be bitter adversaries, and the conflict of personalities which has arisen in the course of this entire litigation has contributed to a situation in which the parties have denied themselves the full discovery they would have otherwise enjoyed had counsel been better able to cooperate among themselves.

■ Apparently, in view of the hard line which the plaintiffs have taken in this action, especially in view of the lack of hard proof to support their allegations of very serious misconduct on the part of defendants, Greenfield and Superior have moved for an award of attorneys fees in this action. Having presided over the 1974 trial and over the present action during the two-and-a-half years in which discovery has only painfully proceeded, the Court cannot conclude that plaintiffs' initial suspicions were entirely unfounded or that the hard line taken, although at times ill-considered and far from commendable, was not altogether unwarranted. Thus, defendants' motion for an award of attorneys' fees will be denied, and judgment in this action will be entered in favor of the defendants, with court costs only to be assessed against plaintiffs.

Accordingly, it is this 3rd day of August, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment be, and the same is, hereby entered in favor of the defendants, Marvin H. Greenfield and Superior Dodge, Inc.;

2. That costs be, and the same are, hereby assessed against plaintiffs Chrysler Corporation, as successor to Chrysler Motors Corporation and Chrysler Credit Corporation;

3. That the Order of this Court, dated March 21, 1977, be, and the same is, hereby DISSOLVED; and

4. That all funds paid into the registry of this Court by plaintiffs equal to the amount of the judgment entered in Civil Action No. 73–646–Y, increased by the amount of any accrued interest and minus the amount of any funds released to the defendants pursuant to the prior order of this Court, be released forthwith to the defendants.