675 F.2d 1349
 110 L.R.R.M. (BNA) 2058, 93 Lab.Cas. P 13,447
 GREAT COASTAL EXPRESS, INC., Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OFAMERICA, Appellant.
GREAT COASTAL EXPRESS, INC., Appellee-Cross-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OFAMERICA,
Appellant-Cross-Appellee.
GREAT COASTAL EXPRESS, INC., Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OFAMERICA, Appellee.
 Nos. 80-1217, 73-2393, 73-2448 and 81-2073.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 7, 1982.
Decided April 12, 1982.
 
 Ira R. Mitzner, Washington, D. C. (Barry Wm. Levine, Kenneth M. Simon, Jeffrey M. Johnson, George Kaufmann, Dickstein, Shapiro & Morin, Washington, D. C., on brief), for appellant.
 J. W. Alexander, Jr., Charlotte, N.C. (Blakeney, Alexander & Machen, Charlotte, N.C., James M. Minor, Jr., Minor, Marshall, Forb & Batzli, P. C., Richmond, Va., on brief), for appellee.
 Before BUTZNER, Circuit Judge, INGRAHAM,* Senior Circuit Judge, and RUSSELL, Circuit Judge.
 INGRAHAM, Senior Circuit Judge.
 
 
 1
 These proceedings were initiated by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT" or "the Union") in an effort to obtain relief from a judgment the Union argues was procured through fraud on the court. In No. 80-1217, IBT appeals the denial by the District Court for the Eastern District of Virginia of its Motion to Set Aside Judgment on the grounds of fraud on that court. Great Coastal Express, Inc., v. International Brotherhood of Teamsters, 86 F.R.D. 131 (E.D.Va.1980). In Nos. 73-2393 and 73-2448, the Union has filed an original petition in this court for relief from our affirmance of the underlying judgment, Great Coastal Express, Inc. v. International Brotherhood of Teamsters, 511 F.2d 839 (4th Cir. 1975), cert. denied, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976), on the same grounds.[1]
 
 
 2
 This dispute arises out of a 1970 strike by IBT against Great Coastal. Great Coastal subsequently brought suit against IBT on two theories: (1) damages to property and equipment caused by union violence; and (2) lost business caused by illegal secondary boycotting. The union violence claim was eliminated from the case by directed verdict at the close of Great Coastal's case in chief. The jury then awarded over $1,000,000 in damages on the secondary boycott claim, which prompted a new trial on damages alone and a second, reduced verdict. The judgment was affirmed as to both liability and damages by this court. Great Coastal Express, supra. IBT subsequently uncovered evidence that the company itself had planned and executed several of the acts of violence described during the suit, and petitioned the district court and this court for relief from the judgment. The district court concluded that company witnesses had indeed perjured themselves in the original trial, but that such facts did not constitute a fraud on the court under Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), or support an independent action for relief. For reasons developed below, we affirm the denial of relief and deny the direct petition in this court.
 
 I. Background
 
 3
 A. History of this Litigation.
 
 
 4
 Great Coastal is an interstate truck carrier based in Richmond, Virginia. In 1970, the company's employees were represented by Local 592, an affiliate of the IBT. From 1964 to March 31, 1970, the parties were signatories to the National Master Freight Agreement. Negotiations for a new agreement were unsuccessful and Local 592 went on strike in August 1970. On December 10, 1970, Great Coastal filed an action in a Virginia state court which was removed by IBT to the Eastern District of Virginia pursuant to 28 U.S.C. § 1441(b), as an action purporting to state a claim under § 8(b)(4) of the Labor-Management Relations Act, 29 U.S.C. 158(b)(4), over which the United States District Courts have original jurisdiction.
 
 
 5
 The case was tried before a jury on the two theories described above, damages caused by union violence and illegal secondary boycotting. From the outset, union counsel objected to the introduction of evidence of violence that was not shown to be connected to the union. On the proffer of Great Coastal that all such evidence would ultimately be linked to the IBT, the district court permitted the company to go forward. Company witnesses testified to wide-spread and savage acts of violence directed towards its employees and property. At the close of the company's case, however, the district court granted the union's motion for directed verdict on the violence claims, holding that the company had failed to meet its burden under United Mine Workers v. Gibbs, 383 U.S. 715, 735-37, 86 S.Ct. 1130, 1143-44, 16 L.Ed.2d 218 (1966), of linking the acts of violence to IBT. The secondary boycott claim was allowed to go to the jury, and the jury found liability on this ground.
 
 
 6
 Although counsel for Great Coastal stated during closing argument that it had shown actual damages proximately resulting from the unlawful secondary boycott activities amounting to $942,065, the jury returned a verdict of $1,300,000. On the union's motion for judgment notwithstanding the verdict, the district court concluded that "the damage award ... was substantially out of touch with damages allegedly proven." 350 F.Supp. 1377, 1380 (E.D.Va.1972). The excessive verdict, in the court's opinion, suggested that:The jury, while well intentioned, was in spite of the Court's instructions to the contra influenced in its consideration of damages by the gross and vicious conduct attributed to the members of the local union and their sympathizers.
 
 
 7
 Id. The court denied the motion for JNOV as to the remaining issues raised by the union, but directed a retrial on damages alone. The second jury reached a verdict of $806,093 and judgment was entered on the secondary boycott claim in that amount.
 
 
 8
 On appeal to this court, IBT argued that the district court erred in submitting to the jury the question whether the local union and its members were agents of the International; that the company had failed to demonstrate what part of its losses were caused by illegal activity as distinguished from legal activity; that the court erred in restricting the new trial to damages; and that the instructions to the second jury were inconsistent and improper. This court affirmed on all issues. Great Coastal Express, supra, 511 F.2d at 841. With respect to the partial new trial issue, the opinion of the court observed that "the union does not contest the fact that there was evidence from which a jury could find an illegal secondary boycott," id. at 842, and further, "it goes without saying that the jury had abundant evidence" to find that IBT had committed unlawful secondary boycotting. Id. at 844. We concluded there was no basis for believing that the evidence of violence had so inflamed the jury as to fatally infect the liability verdict with prejudice, particularly in light of the district court instructions, and that IBT had not overcome the presumption of validity of a verdict. Id. at 847. Certiorari was denied by the Supreme Court and the union paid Great Coastal a total of $961,653.67, representing the judgment plus interest and costs.
 
 
 9
 In February of 1977, counsel for IBT first received information that the company had deliberately sabotaged its own equipment on at least one occasion, and had committed other acts of violence in the evident expectation that responsibility for these acts could be laid on the union. Counsel investigated these matters between March and December 1977 and turned over the results of their investigation to the Justice Department. The Department's response in August 1978 was that the applicable statute of limitations precluded any criminal action with respect to the allegations. The Department made a similar response to an inquiry by the district court in November 1979.
 
 
 10
 IBT filed its motion to set aside the judgment in the district court on December 14, 1978. The court allowed post-judgment discovery and held a two-day evidentiary hearing. At the hearing, two of the company's witnesses from the 1972 trial admitted that part or all of their testimony had been false, and other evidence of fraudulent company practices was introduced. Stressing that the allegations of fraud on the court all were instances of either perjury or fabricated evidence, the district court considered it unnecessary to address the evidence in greater detail but denied relief as a matter of law. The court's decision may be briefly summarized as follows: relief under Federal Rule of Civil Procedure 60(b)(3) would be forthcoming except that the union had not filed its motion within the Rule's one-year time limitation, and this limitation could not be evaded through use of 60(b)(6); perjury and fabricated evidence do not rise to the level of fraud on the court under the savings provisions of Rule 60(b), and that IBT had not shown attorney involvement in the fraud; and similarly that perjury and fabricated evidence were "intrinsic" rather than "extrinsic" forms of fraud and would not support an independent action in equity for relief from a judgment. Great Coastal Express v. International Brotherhood of Teamsters, 86 F.R.D. 131, 136-40 (E.D.Va.1980). This is the principal decision appealed from.
 
 
 11
 The case was briefed and argued before this panel at the November 1980 sitting. We remanded, 639 F.2d 780, with directions that the district court supplement the record with specific findings of fact based upon the evidentiary hearing that had been held. The district court provided these findings by memorandum dated August 27, 1981, and we allowed supplemental briefing and further oral argument.
 
 
 12
 B. The District Court's Findings of Perjury and Fabricated Evidence.[2]
 
 
 13
 The district court found that in October of 1970 during the strike Robert Seward, an employee of Great Coastal, was ordered by Terminal Manager William Funai to get a brick or rock, take a company truck out on the road and "tear it up some." Seward drove the company truck to Route 33 past New Kent, Virginia, broke the windshield of the truck with a brick, and fired three shots into the front of the trailer with a small caliber hand gun. Seward thereafter executed several false affidavits describing this incident, concealing the true events and claiming "unidentified persons" had sabotaged the truck. One of these affidavits was incorporated into Great Coastal's answers to interrogatories as "direct evidence of specific instances of violence, intimidation and secondary boycotting activity." Evidence was also adduced that Funai sent Seward and other company employees to the yards of competing companies that had hired some of the striking Great Coastal drivers, and sabotaged trucks in those yards.
 
 
 14
 After the strike, and after Local 592 had been decertified as representative of the company's employees as the result of an election, Seward received a $500 payment from C. E. Estes, president of the company. Estes told Seward to keep the payment to himself and to consider it a "Christmas bonus or pay for a job well done." The $500 is not reflected anywhere on the company's books and records. Funai also received a payment, a share of the IBT judgment, of approximately $12,000. This payment was ostensibly part of the company's profit-sharing plan; however, Funai was not employed by the company at the time of the recovery of the IBT judgment, and therefore payment of this share to Funai was contrary to company policy regarding profit-sharing.
 
 
 15
 The district court found that Seward had falsely testified in the 1972 trial, as to the New Kent incident and the company's role in fabricating acts of violence, and also that Funai failed to tell the complete truth in violation of his oath as a witness in that trial. The court concluded as follows:
 
 
 16
 The Court is satisfied and finds as a fact that much of the testimony offered by the plaintiff in the first trial dealing with the alleged acts of violence by the defendant were perjured.
 
 
 17
 Just as the perjurors are, regrettably, free from prosecution for perjury by virtue of the statute of limitations, the one year limitation precludes the instant defendant from relief under Rule 60(b)(3) for the reasons stated in the Court's memorandum of February 29, 1980.
 
 II. Discussion
 
 18
 At the outset, Great Coastal urges that the fraud uncovered by the union, inasmuch as it relates to acts of violence, became immaterial once the violence claim was eliminated by directed verdict. The judgment under attack, the company continues, is a secondary boycott judgment that this court has already affirmed in no uncertain terms. We note that this argument is, in effect, that any fraud in the case was harmless error, and that strictly speaking discussion of such a question should be preceded by the threshold determination of whether error has occurred at all (or, in this case, whether the fraud is the type justifying relief from judgment). Nevertheless, we will briefly consider the company's argument here because the parties have given it some priority and it is the principal point stressed in all of the company's submissions to this court.
 
 
 19
 The position of IBT is that once fraud enters the case in any manner, the judgment must be vitiated without further inquiry as to the materiality or effect of the fraud on the judgment, citing Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). In Hazel-Atlas, the successful litigant had used an article in a trade publication in support of a patent application, and subsequently defended the patent in the federal courts. However, in its zeal to assure the success of the patent, company officials had fraudulently attributed the authorship of the article to a nationally known, supposedly impartial figure when in reality the article was authored by a company patent attorney. The Supreme Court noted that whatever influence the article may or may not have had on the patent office and the courts, the company clearly thought it was material and went to some trouble to procure it. The IBT particularly relies on the following language: "(T)hey urged the article upon the Circuit Court and prevailed. They are in no position now to dispute its effectiveness." 322 U.S. at 247, 64 S.Ct. at 1002.
 
 
 20
 No doubt in cases like Hazel-Atlas, where a single cause of action is involved, the IBT's position has merit. A case such as ours, where separate and independent causes of action were alleged, is in that respect somewhat different and we do not believe Hazel-Atlas provides a complete answer. We might be receptive to the company's position that the secondary boycott judgment was insulated from the fraud if in fact the violence claim was effectively and entirely eliminated from the jury's consideration. In such a case, materiality may well be a proper inquiry. Cf. Alberta Gas Chemicals, Ltd. v. Celanese Corp., 650 F.2d 9, 12 (2d Cir. 1981); Wilkin v. Sunbeam Corp., 466 F.2d 714, 717 (10th Cir. 1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973); Mas v. Coca Cola, 163 F.2d 505, 508 (4th Cir. 1947).
 
 
 21
 We cannot say with complete confidence, however, that the fraud was harmlessly excised from the case. This is primarily because of the following factual considerations. First, at the close of the first trial in 1972 the district court did instruct the jury that they were not to consider the evidence of acts of violence in reference to any damages from secondary boycotting, and that the jury should only concern itself with the second boycott claim. However, near the close of his instructions the district court also stated:
 
 
 22
 Don't get off on those despicable acts that were testified to. We are not involved with that anymore with reference to the issue right before you except as a totality of circumstances which may or may not have any bearing on it.
 
 
 23
 Thus, there is the possibility that the perjury and fabricated evidence at issue may have been considered by the jury as part of the "totality of circumstances." As we have noted above, in the course of ordering a partial new trial, the district court acknowledged that the jury may have been improperly influenced by the evidence of acts of violence.
 
 
 24
 Secondly, the company's brief to this court on its prior appeal contained repeated references to the evidence of violence, with specific reference to the New Kent incident and sabotage of equipment. The company argued:
 
 
 25
 The Union's efforts to persuade non-striking employees to stop work were not restricted to peaceful means. Again and again, during the long period of the strike, resort was had to extreme violence.... It would have been permissible for the jury to find, upon these facts, that the Union drew upon the force of the violent acts for its benefit. In combination with the other illegal hot cargo and secondary boycott activity, which was inextricably tied in with the violence, the company's business was brought to a total standstill.
 
 
 26
 Such argumentation falls directly within the prescription of Hazel-Atlas quoted above, see also 322 U.S. at 241, 64 S.Ct. at 999, and we are precluded from inquiring as to its materiality or effect on this court's decision.
 
 
 27
 A. Relief from Judgments Under Rule 60(b).
 
 
 28
 Respect for the finality of judgments is deeply engrained in our legal system. As Justice Story observed, "(i)t is for the public interest and policy to make an end to litigation ...." so that "suits may not be immortal, while men are mortal." Ocean Ins. Co. v. Fields, 18 F.Cas. 532, 539 (No. 10,406) (C.C.D.Mass.1841) (Story, J. sitting as Circuit Judge). See also Southern Pacific RR Co. v. United States, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Equally compelling circumstances may arise, however, in which parties are entitled to be relieved of an unjust judgment arrived at through mistake, ignorance, inadvertence or misconduct. See, e.g., Publicker v. Shallcross, 106 F.2d 949, 952 (3d Cir. 1939), cert. denied, 308 U.S. 624, 60 S.Ct. 379, 84 L.Ed. 521 (1940) ("We believe truth is more important than the trouble it takes to get it.")
 
 
 29
 Federal Rule of Civil Procedure 60 provides the terms on which these two principles are balanced. Rule 60(b)(3) allows a court to relieve a party from final judgment on the grounds of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." A motion under 60(b)(3), however, must be made within one year after the judgment was entered. Thus, the Rule suggests that equitable considerations prevail in such cases for one year, and that the interest in finality of judgments prevails thereafter.
 
 
 30
 We are in complete accord with the conclusions of the district court that 60(b)(3) would have provided relief in this case had the union's motion been timely, and also that 60(b)(6) ("any other reason justifying relief") cannot be used to circumvent the one-year limitation for grounds specified previously in the rule. 86 F.R.D. at 136-37. See also Kerwit Medical Products, Inc. v. N & H Instruments, Inc., 616 F.2d 833, 836-37 n.8 (5th Cir. 1980). We therefore turn to the savings provisions in Rule 60(b).
 
 
 31
 B. "Fraud on the Court".
 
 
 32
 IBT has continuously asserted that it seeks relief from fraud on the court under Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Rule 60(b) specifically provides that "this rule does not limit the power of a court to ... set aside a judgment for fraud upon the court," and the 1946 Notes of the Advisory Committee cites Hazel-Atlas "as an illustration of this situation."
 
 
 33
 The Supreme Court's opinion in Hazel-Atlas reveals the following facts. Hartford-Empire Company had sought a patent for a device that manufactured glass by a process known as "gob-feeding." Faced with "apparently insurmountable Patent Office opposition," Hartford officials devised a scheme for the deliberate purpose of deceiving the hostile Patent Office into awarding them a patent. The scheme was to have a Hartford patent attorney prepare an article praising the process and then procure the signature of an ostensibly disinterested and respected pseudo-author. This plan was carried out and, with the article included in the application, a patent was granted. Shortly thereafter Hartford brought suit in a federal district court charging Hazel-Atlas with infringing the patent. Although the article was part of the voluminous record, the district court dismissed the suit without reference to the article on the ground no infringement was proved. On appeal, however, Hartford directed the court's attention to the article and the court of appeals reversed, quoting the article at some length.
 
 
 34
 Hazel-Atlas had received preliminary information during the litigation that the authorship of the article was fraudulent. Following the court of appeals decision, investigation began in earnest. Although investigators for Hazel- Atlas reported little success from their discussions with the ostensible author, Hartford representatives who had been in clandestine contact with him reported "very successful results," specifically that the "author" was cooperative and would be of great assistance. In the weeks that followed, Hartford paid the author $8000, explaining the payments as a "moral obligation" of the company although there was no prior agreement between the parties that the individual would be compensated.
 
 
 35
 Hazel-Atlas eventually brought suit only after the facts were fully disclosed in a separate lawsuit. The court of appeals denied relief on the grounds that the fraud was not newly discovered, that the article was not a primary basis of its earlier decision, and that it lacked the power to set aside a decree after the expiration of the court term in which the decree was rendered. The Supreme Court reversed.
 
 
 36
 The pertinent parts of the Supreme Court's analysis are as follows: The Court first reasserted the historical equity power of courts to set aside judgments, the enforcement of which would be manifestly unconscionable. The Court characterized the fraud as a "deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." 322 U.S. at 245-46, 64 S.Ct. at 1000-01. Furthermore, the litigation involved did not merely concern the private parties but also "issues of great public moment" associated with the legal monopoly afforded by a patent. Id. at 246, 64 S.Ct. at 1001. The court concluded that the "term rule" was not a bar to equitable relief in such circumstances and directed that the original judgment be set aside. Id. at 248-51, 64 S.Ct. at 1002-04.
 
 
 37
 IBT urges that this case presents all the critical elements of fraud in the Hazel-Atlas case: specifically, that the fabricated testimony here was intended to "help along" the company's damage suit, just as Hartford used the article to help along its patent application; and that both Hartford and Great Coastal tried to buy the silence of the conspirators. The analogy is indeed close in some respects, however we must ultimately reject it.
 
 
 38
 The federal courts that have struggled with the definition of "fraud on the court" in the context of Rule 60(b) have found such a definition elusive, see, e.g., Toscano v. Commissioner, 441 F.2d 930, 933-34 (9th Cir. 1971), but have generally agreed that the concept should be construed very narrowly, see, e.g., Kerwit Medical Products, Inc. v. N & H Instruments, 616 F.2d 833, 836-37 (5th Cir. 1980); Senate Realty Corp. v. Commissioner, 511 F.2d 929, 931, 932-33 (2d Cir. 1975). The principal concern motivating narrow construction is that the otherwise nebulous concept of "fraud on the court" could easily overwhelm the specific provision of 60(b)(3) and its time limitation and thereby subvert the balance of equities contained in the Rule. See Kupferman v. Consolidated Research & Manufacturing Corp., 459 F.2d 1072, 1078 (2d Cir. 1972); 7 Moore's Federal Practice § 60.33 at 511 (1971). Not all fraud is "fraud on the court." 11 Wright & Miller, Federal Practice and Procedure § 2870 at 253 (1973). Thus "fraud on the court" is typically confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged. See Addington v. Farmers Elevator Mutual Ins. Co., 650 F.2d 663, 668 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981); Lockwood v. Bowles, 46 F.R.D. 625, 630 (D.D.C.1969). Professor Moore's suggested formulation is often cited, although the Toscano court observed that it still leaves many aspects of the issue unresolved:
 
 
 39
 "Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. Fraud inter partes, without more, should not be a fraud upon the court, but redress should be left to a motion under 60(b)(3) or to the independent action.
 
 
 40
 7 Moore's Federal Practice § 60.33 at 515 (1971); see also Martina Theater Corp. v. Schine Chain Theaters, 278 F.2d 798 (2d Cir. 1960) (following Moore).
 
 
 41
 In this light we cannot say that the fraud in this case presents a deliberate scheme to directly subvert the judicial process, sufficient to constitute fraud on the court. It is also apparent that the fraud here primarily concerns the two parties involved and does not threaten the public injury that a fraudulently-obtained legal monopoly did in Hazel-Atlas. Cf. Comment, 60 Cal.L.Rev. 531, 557 (1972).
 
 
 42
 Despite the confusion inherent in this doctrine, we are not totally without guideposts. We concur in the appraisal of the district court that the fraud here consists of perjury and fabricated evidence. Early in the Court's analysis in Hazel-Atlas, the Court commented "This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury." 322 U.S. at 245, 64 S.Ct. at 1000. Motivated at least in part by this language, courts confronting the issue have consistently held that perjury or fabricated evidence are not grounds for relief as "fraud on the court." See, e.g., Pfizer, Inc. v. International Rectifier Corp., 538 F.2d 180, 193-95 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); Serzysko v. Chase Manhattan Bank, 461 F.2d 699, 702 (2d Cir.), cert. denied, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972); Porcelli v. Joseph Schlitz Brewing Co., 78 F.R.D. 499 (E.D.Wisc.), aff'd without opinion, 588 F.2d 838 (7th Cir. 1978); Koningsberg v. Security National Bank, 66 F.R.D. 439, 442 (S.D.N.Y.1975); Lockwood v. Bowles, 46 F.R.D. 625, 630 (D.D.C.1969). See also Restatement of Judgments § 126(2)(b). This conclusion is consistent with the general definitional principles just described. Perjury and fabricated evidence are evils that can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible. In addition, the legal system contains other sanctions against perjury. See Lockwood v. Bowles, 46 F.R.D. 625 (D.D.C.1969); Shammas v. Shammas, 9 N.J. 321, 88 A.2d 204 (1952) (Brennan, J.). Fraud on the court is therefore limited to the more egregious forms of subversion of the legal process already suggested, those that we cannot necessarily expect to be exposed by the normal adversary process.
 
 
 43
 IBT also takes exception to the district court's conclusion that fraud on the court requires involvement by attorneys. Involvement of an attorney, as an officer of the court, in a scheme to suborn perjury would certainly be considered fraud on the court. IBT points out, however, that the record in Hazel-Atlas indicates that the company "attorney" who prepared the article with the intent that it be signed by another was in fact a "patent attorney," a title given at least at that time to any registered patent agent, and that he had not attended law school and was not the member of any bar. Other circuits have also recognized that fraud on the court can occur without the involvement of attorneys. See Toscano v. Commissioner, 441 F.2d 930, 933-34 (9th Cir. 1971); Lim Kwock Soon v. Brownell, 369 F.2d 808 (5th Cir. 1966). However, in view of our holding that the type of fraud in this case does not rise to the level of fraud on the court, we need not consider the question of attorney involvement.
 
 
 44
 We therefore conclude that the company's actions, however reprehensible, are not tantamount to fraud on the court.[3]
 
 
 45
 C. Independent Action in Equity.
 
 
 46
 While the IBT initially proceeded under the theory of fraud on the court under Hazel-Atlas and not under the second savings provision of Rule 60(b), the independent action in equity, the district court nevertheless considered and rejected the applicability of this doctrine and IBT has addressed the issue in its briefs. The district court followed the intrinsic/extrinsic fraud distinction described in United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93 (1878). Under this doctrine, fraud must be "extrinsic" to justify relief, that is, fraud that actually prevented an issue from being joined or a party from making a valid claim or defense. See Bizzell v. Hemingway, 548 F.2d 505 (4th Cir. 1977) (collusion between plaintiff's attorney and opposing party). Notwithstanding the considerable criticism leveled against the intrinsic/extrinsic distinction, see, e.g., 11 Wright & Miller, Federal Practice and Procedure § 2868 at 240 (1973), and the debate regarding the effect of Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870 (1891), on the question, it is clear that perjury and false testimony are not grounds for relief in an independent action in the Fourth Circuit for many of the same reasons that apply to fraud on the court. See Durham v. New Amsterdam Casualty Co., 208 F.2d 342, 345 (4th Cir. 1953); Aetna Casualty & Surety Co. v. Abbott, 130 F.2d 40, 43-44 (4th Cir. 1942); Chrysler Corp. v. Superior Dodge, Inc., 83 F.R.D. 179, 186 (D.Md.1979); Prickett v. Duke Power Co., 49 F.R.D. 116, 118 (D.S.C.1970).
 
 
 47
 Referring, apparently, to the extrinsic/intrinsic distinction, IBT argues that the independent action doctrine requires only that the fraud, if disclosed, "would have made a difference in the way ... counsel approached the case or prepared for trial," citing Rozier v. Ford Motor Co., 573 F.2d 1332, 1339-42 (5th Cir. 1978). Under such a formula, the union claims if it had known the truth in this case it would have thoroughly impeached the company's witnesses. We believe the more complete inquiry is described in Addington v. Farmers Elevator Mutual Ins. Co., 650 F.2d 663, 667-68 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981):
 
 
 48
 (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of defendant; and (5) the absence of any adequate remedy at law.
 
 
 49
 (Cites omitted). The particular element that is lacking in this case is a good defense to the action that the IBT was prevented from discovering or asserting because of the fraud. Both parties recognize that the judgment under attack here is the secondary boycott judgment: the union has not proffered any defense to liability for secondary boycotting that it was precluded from asserting because of the company's perjury and we frankly cannot perceive one in light of the comments on the evidence made on the prior appeal, quoted in part supra. Relief was properly denied on this ground as well.
 
 III. Conclusion
 
 50
 We affirm the district court's denial of relief in No. 80-1217 and dismiss the petitions in Nos. 73-2393 and 73-2448. The company's appeal No. 81-2073 is dismissed.
 
 
 51
 SO ORDERED.
 
 BUTZNER, Circuit Judge, dissenting:
 
 52
 I agree with the district court and part II A of the majority opinion that the union would be entitled to prevail had it filed its motion to set aside the judgment, which the company fraudulently obtained, within the one-year period of limitations prescribed by Rule 60(b). But I do not agree that the one-year limitation bars relief to the union. Because the union did not institute proceedings to set aside Great Coastal's judgment within one year after its entry, it must show that Great Coastal practiced fraud upon the court. The rule provides that this type of fraud is not subject to the one-year limitation.
 
 
 53
 I dissent from the majority's conclusion that Great Coastal's fraud does not rise to the level of fraud on the court. The facts satisfy the requirements of fraud on the court that are set forth in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Rule 60(b) was amended in 1946 to reflect the principles expounded in Hazel-Atlas, and the Notes of the Advisory Committee clarify the concept of fraud on the court by citing Hazel-Atlas as "an illustration of this situation" which the amended rule addresses.
 
 
 54
 * Pursuant to the directions of this court, the district court made supplementary findings of fact derived from the 1979 evidentiary hearing on the union's motion for relief from the judgment granted Great Coastal. The district court's findings on remand clearly establish that the officers and employees of Great Coastal engaged in an extensive, deliberate scheme to subvert justice by perpetrating a fraud on administrative and judicial tribunals. Because the district court's findings are essential for the resolution of this appeal, they are quoted as follows:
 
 
 55
 At the evidentiary hearing upon the union's motion to set aside judgment for alleged fraud upon the Court, the union presented nine witnesses: (1) Robert G. Seward, a driver for Great Coastal during the strike; (2) Betty Seward, Robert Seward's wife; (3) William P. Funai, Great Coastal's Terminal Manager during the strike; (4) William Stagg, Jr., Great Coastal's Assistant Terminal Manager during the strike; (5) John Martini, a Great Coastal driver during the strike; (6) Samuel Rogers, a Great Coastal driver during the strike, presently employed by Great Coastal; (7) Mack Fifer, a Great Coastal driver during the strike, presently employed by Great Coastal; (8) Edmond Christian Nuckols, Jr., a Great Coastal employee during the strike; and (9) Carmello Thomas Tuminello, Supervisor and Dispatcher for Adley Express during the strike.
 
 
 56
 No witnesses were called on behalf of (Great Coastal).
 
 
 57
 Charles E. Estes is presently President and owner of Great Coastal, and held those same positions during the strike. During the strike, William P. Funai, the Terminal Manager of Great Coastal, routinely reported any damage of Great Coastal equipment to Estes. Estes personally negotiated the profit-sharing arrangements between key managerial employees and Great Coastal. Funai was a key managerial employee who had direct supervision over the drivers, with the right to hire and fire drivers. Funai described himself as "the boss" of the terminal; a fact which corroborated the testimony of Seward. The drivers took their instructions directly from Funai, and Funai took his instructions directly from Mr. Estes. Funai was on profit-sharing during the strike, a status reserved by the company for managerial personnel. Funai, according to Great Coastal, was entitled to 2% of all Great Coastal profits in excess of $100,000.00 by virtue of his status as a manager; in fact, he received $12,024.22 as his prorated share of the IBT judgment.
 
 
 58
 Edward L. Flinn was manager of Great Coastal during the strike, and is presently a manager with the company. As a manager, Flinn, according to Great Coastal, was on profit-sharing during the strike, and was entitled to 2% of all of Great Coastal's profits in excess of $100,000.00. Flinn received $12,731.12 as his prorated share of the IBT judgment.
 
 
 59
 Robert Williams was Great Coastal's maintenance supervisor and shop foreman during the strike, a position which he presently holds. Williams was part of Great Coastal's management during the strike and was entitled to 2% of all Great Coastal profits in excess of $100,000.00. Williams received $12,822.69 as his share of the IBT judgment.
 
 
 60
 One morning during the strike William Stagg, Assistant Terminal Manager of Great Coastal, was told by C. E. Estes that he wanted to see Great Coastal's Terminal Manager, William Funai. Stagg, in turn, told Funai, who was at his desk adjacent to Stagg's, that Estes wanted to see him. In response to the message, Funai went directly to the second floor where Estes' office was located. In approximately ten to fifteen minutes, Funai came down the stairs and immediately told Stagg to get the pickup truck and go to Belk Floor Covering to relieve Robert Seward. Stagg had never before been asked to relieve any drivers during the strike and it was "very unusual" that the request was made in this instance inasmuch as other drivers were idle and available. Nevertheless, in accordance with Funai's instructions, Stagg got in the company pickup truck, and drove to Belk Floor Covering.
 
 
 61
 On that day, October 23, 1970, Robert Seward was unloading a truck at Belk Floor Covering in the City of Richmond when he was instructed by Stagg to go back to the terminal. Seward got in the pickup truck left by Stagg and went back to the terminal while Stagg finished unloading the trailer at Belk Floor Covering.
 
 
 62
 Seward went directly to the terminal office and reported to his boss, William Funai, who ordered Seward to get a brick or a rock, to take a truck to West Point, to break out the windshield of the truck and to "tear it up some". Funai and Seward discussed the fact that Seward was "going to break up the truck", was going to "shoot the truck" with a gun, and that Seward should wear gloves because "there might be fingerprints".
 
 
 63
 As instructed, Seward got a half brick off of the Great Coastal yard and drove a Great Coastal truck to Route 33 off Interstate 64, past New Kent, and pulled off the road. Seward, wearing gloves in an effort to avoid fingerprints, threw the brick at the windshield on the passenger side three times; the brick bounced off the windshield the first two times, but on the third blow crashed through its center. He then fired three shots into the front of the Great Coastal trailer using a small handgun-a cheap .22 caliber "Saturday Night Special".
 
 
 64
 Seward then proceeded on Route 33 to Green's Restaurant, called the terminal and spoke with Ed Flinn, but rather than tell Flinn the truth, Seward told a contrived story to the effect that unidentified persons had sabotaged the truck. Thereafter, the police arrived and Seward took the officer down the road to a point where a high bank rises from the highway and then levels off into the woods. Although that was not where Seward in fact had inflicted the damage, Seward, in telling his lie to the police, designated that as the place where a brick had been thrown at the windshield of his truck, where he heard gunshots, and where he saw men running from the bank away from the road through the woods. Later that same day Stagg and the employees at the terminal learned that Seward's tractor windshield had been knocked out and his trailer had been "shot up".
 
 
 65
 Seward executed a false affidavit concerning the New Kent incident, identified as IBT Exhibit 3. That affidavit was witnessed by Edward L. Flinn, and was specifically incorporated in Great Coastal's answer to IBT Interrogatory No. 14 as "direct evidence of specific instances of violence, intimidation and secondary boycotting activities which are recorded in written statements attached hereto". Great Coastal's answers to IBT's interrogatories were executed under oath by E. C. Estes, Great Coastal's President, and filed with this Court on March 25, 1971.
 
 
 66
 Seward gave a false affidavit concerning the New Kent incident, identified as IBT Exhibit 4, to a representative of the National Labor Relations Board. Seward also testified falsely about the New Kent incident in a proceeding before the National Labor Relations Board.
 
 
 67
 Seward was called as a witness for Great Coastal at the trial before this Court on June 15, 1972. He falsely testified that he was driving toward New Kent in October 1970 when a brick came through the windshield on the passenger side, and that he saw men running away through the woods. Seward admitted at the hearing in July, 1979 that he gave perjured testimony before this Court in 1972.
 
 
 68
 William P. Funai was called as a witness for Great Coastal at the trial before this Court on June 15, 1972 and testified that during the strike he went to West Point, Virginia to look at a Great Coastal truck and saw "(t)he front windshield was broken on it" and there was "a small hole" in the trailer which looked like it was caused by "a shot, a small caliber gun". When asked in 1972 whether he "saw anybody do anything to that truck", Funai answered, "I seen the damage ... and nothing else". Funai now concedes that he failed to "tell the truth, the whole truth, and nothing but the truth" in his 1972 testimony; he admits that he failed to tell everything he knew about the New Kent incident to the Court and he therefore violated his sworn oath before this Court. When Funai asked whether he told Seward to sabotage his equipment, Funai refused to answer "on the grounds that the answer may tend to incriminate me".
 
 
 69
 The Court's conclusion as to Seward's having testified falsely at the first trial is made independent of Funai's exercise of his right against self-incrimination.
 
 
 70
 Edward Flinn is presently manager at Great Coastal and was also manager at the company during the strike. Some time in 1978 Robert Seward spoke with Ed Flinn at the Great Coastal terminal and told Flinn the truth about the New Kent incident. Flinn stated to Seward that at one time he, Flinn, was trying to trace down the New Kent incident, but someone told Flinn to "lay off" because he was "getting close to something in his investigation". The Court's finding in this regard is admittedly prompted by the absence of any testimonial denial on the part of (Great Coastal).
 
 
 71
 When Local 592 struck Great Coastal in 1970, Adley Express, a trucking company in the Richmond area, enjoyed a greater demand for its services and began hiring extra roadmen who were out on strike against Great Coastal. After the strike began, Ed Flinn, manager of Great Coastal, placed a telephone call to Carmello Thomas Tuminello, dispatcher at Adley. Flinn wanted to know who was in charge at the time, and Tuminello responded that he was. Flinn said, "I'd like to see if you could do us a favor" and asked if Adley was "running any extra road drivers that are out on strike that work at Great Coastal". When Tuminello responded that Adley was running six or seven of them every night, Flinn asked if Adley "could stop running the roadmen on the road, so we could starve the sons of bitches out and make them come back to work at Great Coastal". Flinn went on to say that this would help Great Coastal "get rid of the union". Tuminello told Flinn that his boss, the terminal manager, who was not there at that moment, said the men were qualified drivers, Adley needed extra men, and he would continue to run them until he had further notice from his own boss.
 
 
 72
 During the strike Seward was ordered by Funai to go to Adley and East Coast to "punch tires and tear up trucks" (Tr. 40, 95 (Seward) ). Funai handed three "punches" to Seward that were prepared in Great Coastal's maintenance shop and sent him to a motel in Richmond to wait for the other members of the "raiding" party.
 
 
 73
 That night Seward was met at the motel by three other Great Coastal employees, Sam Rogers, Mack Fifer and Chris Nuckols, and together, upon orders from Funai, they went on a "raid" to Adley, driving to Adley in Nuckols' car. Seward, Rogers and Nuckols punctured tires while Fifer slashed the air hoses off the Adley trucks. Tuminello spotted the four marauders under the Adley trucks while making a yard check, but by the time he returned with assistance, all he found were punctured tires and slashed air lines on the Adley equipment. Tuminello noted that one was wearing a Great Coastal jacket and later recalled the identity of one of them as "Seward".
 
 
 74
 Thereafter, similar acts of vandalism were conducted by Seward and Nuckols at the East Coast Freight yard. Seward was corroborated in regard to these acts by several witnesses.
 
 
 75
 During the strike Funai asked Seward to shoot the windows out of the Great Coastal office with an old double barrel shotgun. Seward declined because there were pickets nearby and the police were also in the vicinity.
 
 
 76
 Also during the strike, Funai instructed Seward and Chris Nuckols to purchase a slingshot for the purpose of breaking truck windshields. The testimony of Seward in this regard is corroborated by Nuckols. Seward and Nuckols purchased a slingshot from a sporting goods store, and Seward was with Funai, the Terminal Manager, when Funai submitted a ticket to Great Coastal petty cash for reimbursement of the slingshot. Seward and Nuckols tried to use the slingshot in the Great Coastal yard to break the windshield of Great Coastal trucks, but their efforts were to no avail because the shot could not be propelled with sufficient force to damage the windshield glass.
 
 
 77
 During the strike Martini heard Estes and Flinn express their appreciation to the drivers for their "irritation and agitation" of the pickets. Martini also heard Estes and other officers of Great Coastal express appreciation when Great Coastal trucks would come in damaged. In response to an inquiry from the Court on the attitude of Great Coastal managers about damage to the trucks, Martini testified that when damaged equipment came into the terminal, these officials would say words to the effect that, "this is what we need".
 
 
 78
 On November 24, 1971, as a result of an election, the National Labor Relations Board decertified Local 592 as representative of Great Coastal employees. Seward had, at the request of a Great Coastal manager, been active in seeking the decertification of the union.
 
 
 79
 Within three weeks of Great Coastal's elimination of the union, Estes called Seward into his office and handed Seward $500.00 in cash. At that time, Estes said to Seward, "keep it to (your)self", and told Seward he could "call it a Christmas bonus or pay for a job well done". This $500.00 payment is no where reflected on the company's books and records. Certain of the company's records for the relevant time period have been destroyed, but Great Coastal's custodian of records has no recollection of the circumstances underlying the destruction of those documents.
 
 
 80
 Emmett Williamson, Great Coastal's Treasurer and General Manager, testified that during the strike each "managerial" employee who was on profit-sharing with Great Coastal was "reassured by the company that he would receive his agreed percentage of profits if the company were later to recover damages from the union".
 
 
 81
 Notwithstanding the company policy that a manager on profit-sharing must have been with Great Coastal at the time of recovery against the IBT, William P. Funai, in July 1976-more than five years after Funai had left the employ of Great Coastal-received $12,024.22 ($8,927.99 net after-tax dollars) as his share of Great Coastal's recovery against the IBT.
 
 
 82
 The Court is satisfied and finds as a fact that much of the testimony offered by the plaintiff in the first trial dealing with the alleged acts of violence by the defendant was perjured.
 
 
 83
 Just as the perjurors are, regrettably, free from prosecution for perjury by virtue of the statute of limitations, the one year limitation precludes the instant defendant from relief under Rule 60(b)(3) for the reasons stated in the Court's memorandum of February 29, 1980.[1]
 
 
 84
 To the district court's findings I need add only that Great Coastal persisted in its fraud when this court heard the union's appeal from the judgment awarding the company damages for the secondary boycott. Contrary to its present position, Great Coastal asserted in its brief that the secondary boycott activity "was inextricably tied in with violence ...." Great Coastal, however, did not reveal that this violence was self-inflicted. Instead, its brief relied on the perjured testimony of Seward and its other witnesses, and it embellished the appellate record with photographs of the truck that Seward, acting on orders of company officials, had damaged with a brick and bullets.
 
 II
 
 85
 It may be well to dispel at the outset the notion that proof of bribery of a judge or juror or of fraud perpetrated by other officers of the court is an essential element of fraud on a court. To be sure, this wrongdoing would be a badge of such fraud, but the opinion in Hazel-Atlas did not rely on this type of misconduct. Commentators have suggested that involvement of an attorney is an essential component of fraud on the court when misconduct of other officers of the court is not established.[2] The Supreme Court, however, neither predicated its decision in Hazel-Atlas on the narrow ground of an attorney's involvement in the litigant's fraud, nor did it identify this as an element of fraud on the court. Consequently, a civil judgment may be set aside because of a litigant's fraud on the court though no wrongdoing is ascribed to an attorney or other officer of the court. Toscano v. Commissioner, 441 F.2d 930 (9th Cir. 1971); Lim Kwock Soon v. Brownell, 369 F.2d 808 (5th Cir. 1966); Dausuel v. Dausuel, 195 F.2d 774 (D.C.Cir.1952).
 
 
 86
 Parenthetically, I note that if proof of fraud by an attorney is required, Great Coastal can retain its fraudulently obtained judgment. Great Coastal's attorneys did not participate in this fraud, and the union does not charge that they did. The sole perpetrators of the fraud were the company's officers and employees who, along with the company, have profited handsomely from the judgment.
 
 
 87
 Also, it may be well to put aside the notion that all fraud that injures an opponent must be brought to the attention of the court within one year of the entry of judgment when bribery of the court or other such egregious misconduct is not alleged. In Hazel-Atlas, the defrauded litigant was mulcted of one million dollars, and the judgment had been entered eight years before it was challenged. The Court acknowledged that "in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered." 322 U.S. at 244, 64 S.Ct. at 1000. But there are exceptions to this general rule. Notwithstanding the eight-year delay, the opinion affirmed the power of federal courts to set aside a fraudulent judgment, saying: "But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable,' they have wielded the power without hesitation." 322 U.S. at 244-45, 64 S.Ct. at 1000-01 (citations omitted).
 
 
 88
 In Hazel-Atlas, the occasion demanding relief was, as here, a judgment obtained by fabricated evidence. There it was a spurious publication to sustain a litigant's claim to a patent both at proceedings in the patent office and in court. The enormity of this long concealed fraud elicited from the Court both condemnation and the proper response of the judiciary. The Court said: 322 U.S. at 246, 64 S.Ct. at 1001,
 
 
 89
 Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud. 322 U.S. at 246, 64 S.Ct. at 1001.
 
 III
 
 90
 Hazel-Atlas explains that a court's power to grant equitable relief against a fraudulent judgment is not a creature of statute; nor, I might add, is it a creature of Rule 60(b). The Court stated:
 
 
 91
 It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations. 322 U.S. at 248, 64 S.Ct. at 1002.
 
 
 92
 Hazel-Atlas requires proof of two elements to establish fraud on the court for the purpose of setting aside a civil judgment when the court itself has not been compromised by bribery or corruption. These two elements distinguish fraud on the court from the type of fraud that Rule 60(b) requires to be asserted within one year. The first is that the judgment involves an issue "of great moment to the public ...." 322 U.S. at 246, 64 S.Ct. at 1001. A dispute that concerns only private litigants is not enough. See S & E Contractors, Inc. v. United States, 406 U.S. 1, 15, 92 S.Ct. 1411, 1419, 31 L.Ed.2d 658 (1972) (dictum).
 
 
 93
 Hazel-Atlas dealt with an affront to the public's interest in the integrity of the nation's patent laws. This case involves an assault on the public's interest in the integrity of the laws governing our national labor policy. There can be no doubt that the dispute between the company and the union implicated interests beyond those of the litigants. Section 1 of the Labor Management Relations Act, 1947, 29 U.S.C. § 141, states in part:
 
 
 94
 It is the purpose and policy of this chapter, in order to promote the full flow of commerce ... to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.
 
 
 95
 Just as a litigant in Hazel-Atlas deceived the patent office by fabricated evidence, Great Coastal deceived the National Labor Relations Board in administrative proceedings pertaining to the same strike that is the subject of this case by fabricating evidence of union violence. Just as a litigant in Hazel-Atlas invoked in judicial proceedings the patent laws that are designed both to grant a monopoly and advance the public interest, Great Coastal invoked the Labor Management Relations Act, particularly 29 U.S.C. §§ 158(b)(4), 185, and 187. As the congressional declaration of purpose and policy states, 29 U.S.C. § 141, these laws, too, are designed to protect the public as well as litigants.
 
 
 96
 I therefore conclude that the litigation culminating in the judgment for Great Coastal satisfied the first requirement of Hazel-Atlas. This litigation involved more than a controversy between private parties, and the fraud by which it was prosecuted debased the laws enacted to assure the free flow of commerce for the benefit of the public.
 
 IV
 
 97
 The second requirement of Hazel-Atlas is best described in the words of the Court, 322 U.S. at 245-46, 64 S.Ct. at 1000-01:
 
 
 98
 This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here ... we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.
 
 
 99
 The unrefuted evidence of the 1979 hearing conducted by the district court and the court's supplementary findings establish beyond doubt that Great Coastal, its officers, and employees engaged in "a deliberately planned and carefully executed scheme to defraud" the National Labor Relations Board, the district court, and the court of appeals. Their fraud was no isolated instance of perjury. To achieve their purposes, the officers and employees created spurious evidence, deceived the Virginia State Police, answered interrogatories under oath untruthfully, filed false affidavits and gave perjured testimony in administrative and judicial proceedings, introduced fabricated exhibits, and filed a corrupt brief and appendix on appeal.
 
 
 100
 By payments and promises of payments, Great Coastal frustrated discovery of its fraud through the judicial processes afforded by the Rules of Civil Procedure. Moreover, its scheme did not end with the entry of judgment. Like the litigant in Hazel-Atlas, it later attempted to forever seal its deception by the payment of large sums of money to the participants in its fraudulent scheme. And, as in Hazel-Atlas, it succeeded in cloaking its wrong for several years.
 
 
 101
 I therefore conclude that this case satisfies the second requirement of Hazel-Atlas.
 
 V
 
 102
 Finally, I find no merit in Great Coastal's argument that the fraud did not taint its recovery of damages. While the evidence concerning the secondary boycott was sufficient to sustain a verdict, this issue presented questions for the jury both on liability and damages. As part II of the majority opinion points out, it cannot be said "with complete confidence ... that the fraud was harmlessly excised from the case." Indeed, the majority opinion states: "We are in complete accord with the conclusions of the district court that 60(b)(3) would have provided relief in this case had the union's motion been timely ...."
 
 
 103
 Great Coastal's argument is similar to the argument rejected in Hazel-Atlas that the fabricated evidence was not "basic" to the judgment under attack. 322 U.S. at 246. There the Court did not attempt to appraise the effect of the fraud on the decision making process. Instead, it pointed out that the fraudulent litigant deemed the spurious document to be material. The litigant contrived the fraud to deceive the patent office and the court. The litigant, therefore, was "in no position now to dispute its effectiveness." 322 U.S. at 247, 64 S.Ct. at 1002.
 
 
 104
 Great Coastal is in the same posture as the fraudulent litigant in Hazel-Atlas. Great Coastal's fraud was conceived and used to deceive the National Labor Relations Board and both trial and appellate courts. The jury that found liability was exposed to the fraud. On appeal Great Coastal argued that violence-which the district court later found was self-inflicted-was inextricably tied in with the secondary boycott. Like the litigant in Hazel-Atlas, Great Coastal is in no position to dispute the effectiveness of its fraud.
 
 
 105
 I would reverse the order of the district court, afford the union equitable relief on its petition filed in this court, and set aside the judgment because, tested by Hazel-Atlas, Great Coastal committed a fraud upon the court.
 
 
 
 *
 Honorable Joe M. Ingraham, Senior United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation
 
 
 [1]
 We also have No. 81-2073, an appeal by Great Coastal Express, Inc. ("Great Coastal" or "the company"), plaintiff in the original suit, from recent findings the district court has made to supplement the record at our request, and a motion to dismiss that appeal. No. 81-2073 and the motion to dismiss have been considered together with the consolidated proceedings
 
 
 [2]
 While we note Great Coastal's objections to various findings made by the district court, the record is clear and essentially undisputed on the matters relevant to the disposition of the case
 
 
 [3]
 IBT argues that the acts of violence directly affected the damage calculation in the second trial as well, because Great Coastal's President repeatedly mentioned the effect of violence on the company and the company's damage study implicitly includes costs incurred by violence. As the preceding discussion indicates, we do not feel that Great Coastal has perpetrated a fraud on the court. Nevertheless the union's argument also suggests that the damage award may be factually incorrect because the union is not responsible for any loss of profit caused by the expense of remedying company-inflicted damage. This method of attack must also be rejected. The jury was carefully instructed that the only damages recoverable were those proximately caused by illegal secondary boycott activity. We have already observed, in the prior decision of this court quoted above, that there was abundant evidence of damage caused by the second boycotting alone. The jury's verdict was less than the company's study projected. When the jury is properly instructed and its verdict is supported by substantial evidence, as we observed in 1975 in this case, our inquiry is ended and we cannot speculate how the particular figure was decided. Nunez v. Superior Oil Co., 572 F.2d 1119, 1124 n.6 (5th Cir. 1978); Burger Chef Systems, Inc. v. Melfred Co., 547 F.2d 786, 791 (4th Cir. 1976)
 
 
 [1]
 The district court's memorandum of February 29, 1980, is reported as Great Coastal Express v. International Brotherhood of Teamsters, 86 F.R.D. 131 (E.D.Va.1980)
 
 
 [2]
 See 7 Moore's Federal Practice P 60.33 at 513-15; 11 Wright & Miller, Federal Practice & Procedure § 2870 at 256